206 F.3d 56 (1st Cir. 2000)
 UNITED STATES, APPELLEE,
v.
NAI FOOK LI, DEFENDANT, APPELLANT.
UNITED STATES, APPELLEE,
v.
YIU MING KWAN, DEFENDANT, APPELLANT.
UNITED STATES, APPELLEE,
v.
JU LIN, DEFENDANT, APPELLANT.
UNITED STATES, APPELLEE,
v.
BEN LIN, DEFENDANT, APPELLANT.
UNITED STATES, APPELLEE,
v.
HUI LIN, DEFENDANT, APPELLANT.
UNITED STATES, APPELLEE,
v.
MAO BING MU, DEFENDANT, APPELLANT.
UNITED STATES, APPELLEE,
v.
SANG LI, DEFENDANT, APPELLANT.
 Nos. 97-2034, 97-2413, 98-1229, 98-1230, 98-1303, 98-1447, and 98-1448.
 United States Court of Appeals, First Circuit
 Heard December 7, 1999
Decided February 29, 2000
 
 George F. Gormley and Edward P. Ryan, Jr., with whom George F. Gormley, P.C., Paul J. Garrity, O'Connor & Ryan, Chris H. Mangos, Charles W. Rankin, Catherine J. Hinton, Rankin & Sultan, Sara A. Rapport, Perkins, Smith & Cohen, and Heidi B. Shore were on brief for appellants.
 William J. Aceves, Martin J. Newhouse, and Ropes & Gray on brief for the Human Rights Committee of The American Branch of the International Law Association, amicus curiae.
 Thomas H. Speedy Rice, John T. Lu, Jean Terranova, and Silverglate & Good on brief for the National Association of Criminal Defense Lawyers, Massachusetts Association of Criminal Defense Lawyers and Amnesty International, amicus curiae.
 Deborah Watson, Attorney, with whom Donald K. Stern, United States Attorney, Alex Whiting, Assistant United States Attorney, and Susan Hanson-Philbrick, Assistant United States Attorney, were on brief for appellee.
 Before Torruella, Chief Judge, Selya, Boudin, Lynch, Stahl, and Lipez, Circuit Judges.
 Stahl, Circuit Judge.
 
 OPINION EN BANC
 
 1
 Defendants-appellants Hui Lin, Nai Fook Li, Yiu Ming Kwan, Ju Lin, Mao Bing Mu, Sand Li, and Ben Lin (the "appellants") appeal their convictions and sentences, which arose from a failed attempt to smuggle Chinese aliens into the United States. This opinion addresses their claim that the convictions and sentences should be overturned because the United States violated their purported rights under two international treaties.[1] We hold that even if the treaties granted individual rights to the appellants, the remedies they seek would be unavailable. Therefore, we reject the treaty-based challenges. A companion opinion issued today by the panel that originally heard the appeals addresses the various other claims raised by the appellants.
 
 Factual Background
 
 2
 In December, 1995, Yiu Ming Kwan, a Chinese national, met in Boston with Michael Rendon, whom he believed owned a boat which could be hired to meet a freighter transporting illegal aliens from the People's Republic of China ("China") to the United States. Rendon was actually an undercover agent of the Immigration and Naturalization Service ("INS"). At the first meeting, Kwan told Rendon that his associates wished to smuggle about 100 illegal aliens into the United States. Rendon proposed a price of $500,000 to meet the smugglers' ship at sea, take in the aliens, and bring them into the United States on his vessel. After this preliminary discussion, Kwan asked Rendon to meet him and two associates at Logan International Airport the following day.
 
 
 3
 The next day, Rendon, along with Coast Guard Agent Rick Cox and two other agents, brought Kwan, Hui Lin, and another male -- the latter two also Chinese nationals -- to view Rendon's craft. The vessel had a fifty-foot hold with a single light and a partial wooden plank floor. The hold contained no tables, chairs, windows, bathroom, or kitchen. The smugglers told the agents they were satisfied with the boat's accommodations.
 
 
 4
 On July 22, 1996, Rendon and Cox met with Kwan, Hui Lin, Nai Fook Li, and an unidentified man. At this meeting a site about 180 miles north of Bermuda was chosen as a rendezvous point. A discussion ensued about the spartan conditions in the hold of Rendon's vessel, and Hui Lin stated that the aliens "will have to sit there" and would not be able to sleep for the two days it would take for the craft to return to port. Nai Fook Li told Rendon that life jackets for each smuggled alien would not be necessary. Rendon sought and received assurances that the smugglers would assign individuals to his ship to control the aliens. A final price of $500,000 was agreed upon for the offloading of 120 aliens, plus $4,000 for each additional person. The smugglers also agreed to pay a $35,000 deposit to cover Rendon's expenses.
 
 
 5
 Meanwhile, defendant Sang Li and others contacted individuals in China offering passage to the United States. Sang Li quoted prices between $20,000 and $30,000 per person, to be lent to the emigrants at very high interest rates. On or about August 11, 1996, those who took up the offer were loaded into the XING DA, a 210-foot freighter that had previously carried agricultural chemicals. Among the passengers were Sang Li, Mao Bing Mu, Ju Lin, and Ben Lin.
 
 
 6
 Eighty-three aliens were confined to the XING DA's hold for approximately 54 days as the ship traveled to the Bermuda rendezvous. Food in the hold consisted of buckets of rice and turnips lowered below twice each day. About once every ten days, each emigrant was given one bottle of water. The aliens were allowed above deck to use the bathrooms only during the daytime. The living area, which was never cleaned, thus became littered with urine and feces. Apparently, Sang Li and Mao Bing Mu directed one of the aliens on four or five occasions to ladle the human waste into a bucket. Several times, aliens in the hold attempted to steal additional food and water. Those who were caught were beaten. One alien as punishment was denied food for two days. Twenty-six of the passengers lived above deck.
 
 
 7
 Kwan kept Rendon apprised of the XING DA's position. On September 23, 1996, Rendon and Cox met with Kwan, Hui Lin, and Nai Fook Li. Li gave Cox the XING DA's current location and told him that approximately 120 people would be transferred from the XING DA to Rendon's vessel. Li agreed to board Rendon's vessel to help control the passengers. The men met again on September 25, 1996 and decided that Rendon's vessel would leave port on September 28 to meet the XING DA. Lin gave $5,000 to Nai Fook Li, who then gave it to Rendon to be used to obtain temporary shelter for the passengers upon arrival in the United States. At Cox's request, Hui Lin provided him another $1,000 for food. On September 27, 1996, the five men met again, and Hui Lin gave Rendon $29,000 to complete the deposit. It was agreed that the aliens would live in a warehouse until the defendants had paid the remainder of the $500,000 to Rendon, at which time the aliens would be taken to New York City.
 
 
 8
 On September 28, 1996, Rendon, Cox, Nai Fook Li, and four undercover agents apparently posing as Rendon's crew departed in the vessel heading for the rendezvous with the XING DA. The agents also had arranged for a Coast Guard cutter to trail their boat and intercept the XING DA.
 
 
 9
 On October 2, 1996, a different Coast Guard cutter -- the RELIANCE -- spotted the XING DA and followed it for about three miles. After the RELIANCE crew attempted to make contact several times, the XING DA finally responded and consented to be boarded by the Coast Guard. Officer Patrick Hilbert and seven other Coast Guard officers boarded the XING DA. When Hilbert asked who was in charge, Ju Lin represented that he was the ship's master. After Hilbert viewed the ship's documentation, a second boarding party came on board and discovered the eighty-three aliens in the hold.
 
 
 10
 The XING DA was taken to Bermuda. During this trip, the XING DA's crew retained operational control, and Ben Lin steered and handled the navigation. All aboard the XING DA were offloaded in Bermuda and flown to Guantanamo Bay, Cuba, where they were interviewed by INS officers. During the week of November 18, 1996, after negotiations between the United States Department of State and the government of China, ninety-three aliens were repatriated and returned to China.
 
 
 11
 Meanwhile, on October 3, 1996, Hui Lin, Yiu Ming Kwan, and Nai Fook Li (the "land-based defendants") were arrested, and on October 8, 1996, an indictment was returned against them. On November 5, 1996, a superceding indictment was returned, adding Ju Lin, Ben Lin, Mao Bing Mu, and Sang Li (the "shipboard defendants") as defendants. The shipboard defendants, who had been detained at Guantanamo, were arrested on November 15, 1996 and were provided with counsel five days later. A final superceding indictment was issued on March 18, 1997, charging all defendants with (1) conspiracy to bring aliens into the United States for purposes of commercial advantage, in violation of 18 U.S.C. § 371; (2) alien smuggling in violation of 8 U.S.C. § 1324(a)(2)(B)(ii); (3) conspiracy to bring aliens into the United States at a place other than a designated port of entry in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(II); and (4) attempting to bring aliens into the United States at a place other than a designated port of entry in violation of 8 U.S.C. §§ 1324(a)(1)(A)(i), (v)(II).
 
 
 12
 On March 27, 1997, all seven defendants moved to dismiss the indictment on the grounds that the government failed to comply with the provisions of (1) Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261, 1967 WL 18349 (ratified November 24, 1969) (the "Vienna Convention") and (2) Article 35 of the United States - People's Republic of China Bilateral Convention on Consular Relations, September 17, 1980, 33 U.S.T. 2973, 1982 WL 212240 (ratified February 19, 1982) (the "Bilateral Convention"). The shipboard defendants subsequently moved, on the same grounds, to suppress (1) all physical evidence seized from the XING DA; (2) all identifications made by any Chinese national who had not been notified of his or her purported rights under the treaties; and (3) all testimony regarding the events of the voyage by any Chinese national who had not been notified of his or her rights under the treaties.
 
 
 13
 On April 3, 1997, the district court denied the appellants' motions to dismiss and to suppress. First, the district court found that the treaties bestowed no enforceable rights upon individual detained aliens. Second, the court found that no constitutional or statutory provision conferred jurisdiction to enforce the treaties upon Article III courts. Third, the district court concluded that even if the appellants had standing to enforce the treaty, dismissal of the indictment would be an inappropriate remedy.
 
 
 14
 Defendants Nai Fook Li, Yiu Ming Kwan, Hui Lin and Ju Lin each pled guilty to all four counts but reserved their rights to appeal the pretrial rulings. Following a twelve-day jury trial, defendants Ben Lin,Mao Bing Mu, and Sang Li were convicted on all four counts. The defendants were individually sentenced, with terms of imprisonment ranging from 36 months to 144 months, plus supervised release of 36 months each. All appellants challenged their sentences, and those defendants who went to trial contested their convictions as well. Although the appellants raise various arguments, we deal in this en banc opinion solely with those relating to the alleged violations of the Vienna Convention and the Bilateral Convention.
 
 
 15
 A three-member panel of this Court heard oral argument on April 6, 1999. On August 6, 1999, before the panel released an opinion, we issued a sua sponte order holding that the court would convene en banc to decide two issues related to the treaties:
 
 
 16
 (1) Whether the Vienna Convention... and/or the... Bilateral [Convention] create individual rights as to consular notification and access, that are enforceable by such individuals in court proceedings, and
 
 
 17
 (2) If so, is there a remedy (such as suppression of evidence or dismissal of the [indictments]) for past violations of these rights that can be invoked by a defendant in a criminal prosecution in a federal or state court?
 
 Discussion
 
 18
 Those courts that have faced the issues before us have come to divergent conclusions as to whether the Vienna Convention and the Bilateral Convention bestow any rights upon individuals, as opposed to states. We need not, however, address these issues, for we believe that even if the treaties do confer individual rights, the appellants' claims could only succeed if violations of those rights could be remedied by the suppression of evidence or the dismissal of an indictment. We hold that irrespective of whether or not the treaties create individual rights to consular notification, the appropriate remedies do not include suppression of evidence or dismissal of the indictment.[2]
 
 I. The Treaties
 
 19
 Article 36(1)(b) of the Vienna Convention states that the authorities of a "receiving state" -- in this case, the United States --shall, without delay, inform any detained foreign national of his right to have the consular post of the "sending state" -- in this case, China -- notified of his detention. Vienna Convention, art. 36(1)(b). Article 36(1)(c) gives consular officers the right to visit and correspond with the detained foreign national and to arrange for his legal representation. See id. art. 36(1)(c).
 
 
 20
 Article 35(2) of the Bilateral Convention states that if a foreign national is detained, the authorities of the receiving state shall, within four days of the date of detention, notify the consulate of the sending state. See Bilateral Convention, art. 35(2). Moreover, the receiving country's authorities are required to advise the detainee of his right to communicate with a consular officer. See id. art. 35(3). The Bilateral Convention further guarantees a consular official's entitlement to visit and correspond with the detainee and to assist in arranging for legal representation and for an interpreter. See id. art. 35(4).
 
 II. Interpreting the Treaties
 
 21
 The United States Constitution provides that ratified treaties are to be regarded as the law of the land. See U.S. Const. art. VI, cl. 2. However, treaties do not generally create rights that are privately enforceable in the federal courts.
 
 
 22
 A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamation, so far as the injured parties choose to seek redress.... It is obvious that with all this the judicial courts have nothing to do and can give no redress.
 
 
 23
 Head Money Cases, 112 U.S. 580, 598 (1884); see also Charlton v. Kelly, 229 U.S. 447, 474 (1913); Foster v. Neilson, 27 U.S. (2 Pet.) 253, 306 (1829) ("The judiciary is not that department of the government, to which the assertion of its interest against foreign powers is confided."). "[E]ven where a treaty provides certain benefits for nationals of a particular state... it is traditionally held that any rights arising from such provisions are, under international law, those of states and... [that] individual rights are only derivative through the states." Matta-Bellesteros v. Henman, 896 F.2d 255, 259 (7th Cir. 1990) (quoting United States ex. rel. Lujan v. Gengler, 510 F.2d 62, 67 (2d Cir. 1975)) (internal quotation marks omitted); see also Goldstar (Panama) S.A. v. United States, 967 F.2d 965, 968 (4th Cir. 1992); Committee of United States Citizens Living in Nicar. v. Reagan, 859 F.2d 929, 937-38 (D.C. Cir. 1988).
 
 
 24
 Even stronger than the presumption against private rights of action under international treaties is the presumption against the creation of rights enforceable by the suppression of evidence or by the dismissal of an indictment. Historically, such remedies have been available only in cases implicating the most fundamental of rights. This class has heretofore been limited to those paramount protections secured by the Fourth, Fifth, and Sixth Amendments to the United States Constitution. See, e.g., Miranda v. Arizona, 384 U.S. 436 (1966) (Fifth Amendment); Massiah v. United States, 377 U.S. 201 (1964) (Sixth Amendment); Mapp v. Ohio, 367 U.S. 643 (1961) (Fourth Amendment); see also United States v. Hensel, 699 F.2d 18, 29 (1st Cir. 1983) (observing that the exclusionary rule is designed "to protect certain specific, constitutionally protected rights"); United States v. Rodrigues, 68 F. Supp. 2d 178, 185 (E.D.N.Y. 1999) ("[A]s the effect of [suppression] is the loss of relevant and probative evidence, this remedy is not applied for every violation of a federal law but is reserved only for breaches of the most basic constitutional rights.").
 
 
 25
 Article 36 of the Vienna Convention, and the complementary Article 35 of the Bilateral Convention, do not create -- explicitly or otherwise -- fundamental rights on par with the right to be free from unreasonable searches, the privilege against self-incrimination, or the right to counsel. See, e.g., United States v. Ademaj, 170 F.3d 58, 67 (1st Cir. 1999) ("[T]he Vienna Convention itself prescribes no judicial remedy or other recourse for its violation."); Waldron v. INS, 17 F.3d 511, 518 (2d Cir. 1993) ("Although compliance with our treaty obligations clearly is required, we decline to equate such a provision with fundamental rights."); United States v. Chaparro-Alcantara, 37 F. Supp. 2d 1122, 1125 (N.D. Ill. 1999) ("It is clear that Article 36 does not create a 'fundamental' right, such as the Sixth Amendment right to counsel, or the Fifth Amendment right against self-incrimination which originates from concepts of due process."). Defendants who assert violations of a statute or treaty that does not create fundamental rights are not generally entitled to the suppression of evidence unless that statute or treaty provides for such a remedy. See, e.g., United States v. Thompson, 936 F.2d 1249, 1252 (11th Cir. 1991) ("Absent a specific reference to an exclusionary rule, it is not appropriate for the courts to read such a provision into [an] act."); United States v. Kington, 801 F.2d 733, 737 (5th Cir. 1986) (holding that rights created by Congress are not enforceable by suppression unless Congress has specifically provided for that remedy); Chaparro-Alcantara, 37 F. Supp. 2d at 1125 ("[Article 36] does not create a 'fundamental' right," and therefore "the suppression remedy must be available, if at all, from the Vienna Convention itself.").
 
 
 26
 Nor are such defendants entitled to the dismissal of an indictment: "Because the public maintains an abiding interest in the administration of criminal justice, dismissing an indictment is an extraordinary step." United States v. Stokes, 124 F.3d 38, 44 (1st Cir. 1997); see also United States v. Morrison, 449 U.S. 361, 365 (1981) (concluding that the dismissal of an indictment was unwarranted absent a constitutional violation that prejudiced defendant's case); Whitehouse v. United States Dist. Court, 53 F.3d 1349, 1359 (1st Cir. 1995) ("When a federal court uses its supervisory power to dismiss an indictment it directly encroaches upon the fundamental role of the grand jury. That power is appropriately reserved, therefore, for extremely limited circumstances."); United States v. Carrillo, 70 F. Supp. 2d 854, 862 (N.D. Ill. 1999) (holding that violation of Vienna Convention would not require suppression of evidence or dismissal of indictment). Thus, we will infer neither an entitlement to suppression nor an entitlement to dismissal absent express, or undeniably implied, provision for such remedies in a treaty's text. We find no such provision here.
 
 A. The Treaties' Texts
 
 27
 "In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." United States v. Alvarez-Machain, 504 U.S. 655, 665 (1992); see also Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 534 (1991); Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699 (1988); Marquez-Ramos v. Reno, 69 F.3d 477, 480 (10th Cir. 1995); Kreimerman v. Casa Veerkamp, S.A. de C.V., 22 F.3d 634, 638 (5th Cir. 1994). But the Vienna Convention and the Bilateral Convention are both facially ambiguous on the subject of whether they create individual rights at all, and do not even address whether those rights would justify suppression of evidence or the dismissal of an indictment. First, it is far from clear that the Vienna Convention confers any rights upon criminal defendants. Cf. Breard v. Greene, 118 S. Ct. 1352, 1356 (1998) ("[N]either the text nor the history of the Vienna Convention clearly provides a... right of action in United States' courts to set aside a criminal conviction and sentence for violation of consular notification provisions."). The appellants emphasize the privileges purportedly conferred by Article 36, but the Vienna Convention's preamble explicitly disclaims any attempt to create individual rights: "[T]he purpose of such privileges and immunities [as are created by the treaty] is not to benefit individuals but to ensure the efficient performance of functions by consular posts." Preamble to Vienna Convention, 21 U.S.T. 77, 79. Moreover, the preamble's drafters cite an intent to "contribute to the development of friendly relations among nations" without ever mentioning any intent to equip defendants with the extraordinary remedies sought by appellants. Id.
 
 
 28
 The Bilateral Convention, too, is ambiguous. Article 35 is replete with references to consular officers' entitlements, see Bilateral Convention arts. 35(1), 35(4), 35(5), 35(6), but only once speaks of the "rights" of detained nationals, and never proposes any particular remedies for the violation of any such rights. Article 35(3) reads as follows:
 
 
 29
 The competent authorities of the receiving state shall immediately inform the national of the sending State of the rights accorded to him by this Article to communicate with a consular official.
 
 
 30
 This language, however, offers insufficient support for appellants' arguments. Even if we were to hold that Article 35(3) in fact provided individuals with judicially enforceable rights -- and we decline to so hold in this case -- this language hardly justifies the inference that violation of such rights should be remedied via the suppression of evidence or the dismissal of an indictment. As described above, these remedies are reserved for extraordinary encroachments upon the most fundamental individual rights. Nothing in Article 35(3) of the Bilateral Convention suggests that the "rights" to which it refers are at all comparable to the right to be free from unreasonable searches and seizures, the privilege against self-incrimination, or the right to representation during a criminal proceeding.
 
 
 31
 Indeed, the balance of Article 35 clearly mitigates any focus on the individual that section (3) might suggest. Even those provisions that arguably serve the interests of criminal defendants are couched instead in terms of the interests of the consular officer. Thus, for example, Article 35(1) provides that "[a] consular officer shall be entitled... to communicate and meet with any national of the sending State," and Article 35(4) states that "[a] consular officer shall be entitled to visit a national of the sending State who has been arrested." We believe that if the authors of the Bilateral Convention intended Article 35 to confer fundamental individual rights of the sort that could be remedied by suppression or dismissal, they would have drafted that Article in terms of those rights, rather than focusing so intently upon the entitlements of consular officers -- officers whose protections under such a clause would be far less reaching than those of criminal detainees.
 
 B. Nontextual Sources
 
 32
 To the extent that the treaties' terms are ambiguous with respect to the issue before us, we will rely upon nontextual sources "such as the treaty's ratification history and its subsequent operation." United States v. Stuart, 489 U.S. 353, 366 (1989).
 
 1. State Department Interpretation
 
 33
 We first consult the United States Department of State's interpretation of the two treaties, to which we accord substantial deference. See, e.g., El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 119 S. Ct. 662, 671 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."); Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 185 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); Kolovrat v. Oregon, 366 U.S. 187, 194 (1961) (same).
 
 
 34
 In the State Department's view, the treaties do not create individual rights at all, much less rights susceptible to the remedies proposed by appellants. After "devot[ing] considerable time to the issue," see Department of State Answers to the Questions Posed by the First Circuit in United States v. Nai Fook Li ("Answers") at A-2, the State Department has concluded that
 
 
 35
 [t]he [Vienna Convention] and the US-China bilateral consular convention are treaties that establish state-to-state rights and obligations.... They are not treaties establishing rights of individuals. The right of an individual to communicate with his consular official is derivative of the sending state's right to extend consular protection to its nationals when consular relations exist between the states concerned.
 
 
 36
 Id. at A-3; see also id. at A-1. "The [only] remedies for failures of consular notification under the [Vienna Convention] are diplomatic, political, or exist between states under international law." See id. at A-3.[3]
 
 
 37
 Nor is the State Department's position of recent origin. A 1970 letter sent by a Department legal adviser to the governors of the fifty states shortly after the Vienna Convention's ratification advised that the Department did "not believe that the Vienna Convention will require significant departures from the existing practice within the several states of the United States." Needless to say, the creation of rights on par with those guaranteed by the Fourth, Fifth, and Sixth Amendments to the United States Constitution would constitute just the sort of "significant departure[]" disclaimed by this letter. Accordingly, the Department has denied the availability of criminal remedies for failures of consular notification. In 1989, a letter from a Department legal adviser informed a foreign national being held in an American prison that "[w]hile the U.S. authorities are required to comply with the obligations [of Vienna Convention Article 36], failure to do so would have no effect on [his] conviction or incarceration."
 
 
 38
 Moreover, the State Department has advanced the same view before at least two international tribunals. In 1998, Paraguay brought suit against the United States in the International Court of Justice ("ICJ"). Paraguay, which sought to halt the execution of a Paraguayan national named Angel Breard in the Commonwealth of Virginia, argued that Breard had not received consular notification and that his conviction was therefore tainted. In an oral presentation to the ICJ, a State Department Assistant Legal Adviser for United Nations Affairs offered the following response:
 
 
 39
 Paraguay's Application maintains that the necessary legal consequence for any... breach [of the consular notification obligation] is that [an] ensuing conviction and sentence must be put aside. There is absolutely no support for this claim in the language of the [Vienna] Convention. The Court should not read into a clear and nearly universal multilateral instrument such a substantial and potentially disruptive additional obligation that has no support in the language agreed by the parties.
 
 
 40
 Verbatim Record (Paraguay v. U.S.), 1998 I.C.J. 426, at 3.20.
 
 
 41
 The issue also arose in the Inter-American Court of Human Rights ("IACtHR") in 1998, when Mexico sought an advisory opinion on the availability of criminal remedies for failures of consular notification.[4] In a written submission to the IACtHR, counsel for the State Department argued that the Vienna Convention "does not require the domestic courts of State parties to take any actions in criminal proceedings, either to give effect to its provisions or to remedy their alleged violation." Written Observations of the United States of America, Request for Advisory Opinion OC-16, June 1, 1998 (corrected June 10, 1998).
 
 2. Legislative History
 
 42
 Legal materials produced contemporaneously with the two treaties' passages comport with the State Department's view that they do not confer rights the violation of which can be remedied in the criminal courts. For example, a State Department legal adviser submitted written testimony on the Vienna Convention to the Senate Committee on Foreign Relations on October 7, 1969. The statement indicated that "[t]he Vienna... Convention does not have the effect of overcoming Federal or State laws beyond the scope long authorized in existing consular conventions," except with respect to a warrant requirement not relevant here. The Department's testimony also emphasized the Vienna Convention's above-quoted preamble, which states explicitly that the treaty's purpose is "not to benefit individuals." Appendix, Sen. Doc. Exec. E, 91st Cong., 1st Sess. (1969).
 
 
 43
 Two weeks later, the Senate Committee on Foreign Relations transmitted the Vienna Convention to the full Senate and recommended ratification. Committee Chairman Senator J. William Fulbright included a short accompanying Report. The Report again highlighted the treaty's preamble and then listed five factors that helped to secure the Committee's approval. The first factor was the Committee's belief that "[t]he [Vienna] Convention does not change or affect present U.S. laws or practice." Sen. Doc. Exec. E, 91st Cong., 1st Sess. (1969).
 
 
 44
 The Committee on Foreign Relations appended a similar Report when it sent the Bilateral Convention to the full Senate in 1981. Like the treaty itself, the Report characterized Article 35 only in terms of the entitlements bestowed upon consular officials:
 
 
 45
 Article 35... guarantees that a consular officer of a sending state will be notified within a maximum of four days of the arrest or detention of a national of the sending state. The consular official is further entitled to visit such national within two days from the date of the notification of arrest or detention as well as to attend the trial of such person.
 
 
 46
 Sen. Exec. Rep. No. 97-14, 97th Cong., 1st Sess (1981).[5] The Committee appended to the Report testimony from Assistant Secretary of State John H. Holdridge, who also cast the treaty's consular notifications provisions in terms of the privileges conferred upon consular officials, rather than upon criminal defendants. See id.
 
 3. The Treaties' Historical Application
 
 47
 Finally, the manner in which the Vienna Convention and the Bilateral Convention have been treated since their ratification confirms the lessons learned from the State Department's interpretation and the treaties' legislative histories: Individual defendants deprived of consular notification are not entitled to raise their treatment as a defense against criminal prosecution.
 
 
 48
 Indeed, the State Department is apparently "unaware of any country party to any consular convention with the United States that remedies failures of notification through its criminal justice process. Criminal justice systems vary throughout the world and in [the State Department's] experience operate independently of consular notification." Answers at A-1. "Many, if not most, of the countries with which the United States raises concerns that consular notification obligations have been violated with respect to U.S. citizens will undertake to investigate the alleged violation and, if it is confirmed, to apologize for it and undertake to prevent future recurrences." Id. at A-3. This representation accords with that made to the ICJ by the State Department's Assistant Legal Adviser for Consular Affairs during the dispute with Paraguay described above. She stated that the Department was "not aware of any practice [among signatories to the Vienna Convention] of attempting to ascertain whether [a] failure of notification prejudiced the foreign national in criminal proceedings." Verbatim Record (Paraguay v. U.S.), 1998 I.C.J. 426, at 2.15. As she asserted, "[t]his lack of practice is consistent with the fact and common international understanding that consular assistance is not essential to the criminal proceeding against a foreign national." Id.The Department's written directives to United States consular officers are also instructive. The Foreign Affairs Manual ("FAM") urges United States consular officials aggressively to pursue contact with American nationals detained abroad, and to raise concerns about failures of consular notification with the receiving country. See 7 FAM 410. Nowhere, though, does the FAM state or imply that such failures might be redressed in the host country's criminal justice system. Thus, the United States has never, to the Department's knowledge, asked a foreign court to consider a failure of consular notification during deliberation on a criminal case. These practices evidence a belief among Vienna Convention signatory nations that the treaty's dictates simply are not enforceable in a host nation's criminal courts, and do not warrant suppression or dismissal in any event.
 
 Conclusion
 
 49
 The remedies sought by appellants are unavailable to them under either the Vienna Convention or the Bilateral Convention. Therefore, irrespective of whether those treaties create individual rights, the defenses asserted must be denied.
 
 
 50
 The appellants' treaty-based challenges are rejected, and the balance of this case is remitted to the panel.
 
 
 51
 Separate opinions follow.
 
 
 
 NOTES:
 
 
 [1]
 It appears that this issue is only relevant to three of the seven appellants. The notices of appeal filed in this case indicated only that the defendants intended to appeal their sentences and, in the case of those who went to trial, the judgments against them. In their opening appellate briefs, appellants Mao Bing Mu, Sang Li, and Ben Lin explicitly presented arguments regarding their purported rights under the two treaties. The remaining defendants -- Hui Lin, Nai Fook Li, Yiu Ming Kwan and Ju Lin -- failed to raise, and therefore forfeited, those arguments. See, e.g., Pignons v. Polaroid Corp., 701 F.2d 1, 3 (1st Cir. 1983) (finding arguments not raised in initial appellate brief waived).
 
 
 [2]
 We do not decide whether a federal court could order access to a national denied a meeting with a consular official.
 
 
 [3]
 However, elsewhere in its responses to the court's inquiries, the State Department acknowledged that "[t]he question whether an individual could enforce consular notification obligations in some other way, such as through a mandamus action" -- a question we decline to consider here -- "is not [one it] has had to address officially." Answers at A-6.
 
 
 [4]
 The United States is not a party to the treaty that formed the IACtHR, and is not bound by that court's conclusions. Nonetheless, as a member of the Organization of American States ("OAS"), the United States may participate in the IACtHR's advisory proceedings.
 
 
 [5]
 We emphasize that this history casts further doubt on any argument that Article 35(3)'s stray reference to detainees' "rights" conferred fundamental protections of the sort that can be vindicated by suppression of evidence or the dismissal of an indictment. We do not believe that the committee would choose to focus on consular rights and yet neglect to mention the creation of new fundamental rights for criminal defendants if Article 35 in fact created such rights.
 
 
 
 52
 SELYA and BOUDIN, Circuit Judges (concurring).
 
 
 53
 Judge Stahl's sterling opinion for the en banc court properly lays stress on the lack of basis for the principal remedy sought in these cases. That remedy -the exclusion of otherwise legitimate evidence - is nowhere suggested in the treaties at issue and courts ordinarily do not provide such remediation in the absence of a constitutional violation. The record before us offers no meaningful reason to stray from that well-trod path. Thus, we join the court's opinion. We write separately, however, because we believe that, even without reaching the remedy question, the appellants' argument lacks force.
 
 
 54
 We arrive at this position essentially by drawing logical conclusions from many of the same considerations that are noted in the court's opinion. It is common ground that the treaties in question are agreements among sovereign States. Nothing in their text explicitly provides for judicial enforcement of their consular access provisions at the behest of private litigants. Of course, there are references in the treaties to a "right" of access, but these references are easily explainable. The contracting States are granting each other rights, and telling future detainees that they have a "right" to communicate with their consul is a means of implementing the treaty obligations as between States. Any other way of phrasing the promise as to what will be said to detainees would be both artificial and awkward.
 
 
 55
 Even if such references sufficed to make the treaties ambiguous as to an intent to create private rights - an assumption that we believe is unwarranted and that we indulge solely for argument's sake - the end result would be the same. Ambiguity brings into play the background presumption in respect to treaties between States - a presumption which holds that they do not create rights that private parties may enforce in court. See, e.g., Goldstar v. United States, 967 F.2d 965, 968 (4th Cir. 1992); Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 808 (D.C. Cir. 1984) (Bork, J., concurring). This presumption certainly can be overcome by explicit language that is easy to draft and to insert, just as a contract can provide expressly that rights created by it may be enforced in court by a third-party beneficiary. In addition, rights-granting language occasionally may make sense only on the premise that it confers a right enforceable by a private citizen in the courts of the other country. See, e.g., Clark v. Allen, 331 U.S. 503, 507-08 (1947) (dealing with language that involved non-citizens' rights to inherit property equally with citizens). But apart from these narrow circumstances, the presumption rules.
 
 
 56
 In this instance, the treaties contain no explicit language conferring on private citizens rights enforceable in court, and there is nothing in the character of the subject matter that compels (or even suggests) an inference in favor of private rights. To the contrary, it is entirely reasonable to think that States themselves will enforce their right to afford consular access to detained citizens; after all, States normally seek to protect their own citizens in foreign lands and consular access facilitates a State's carrying out of that responsibility. Cf. Preamble to Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 79 (ratified Nov. 24, 1969) (describing treaty as ensuring "efficient performance of functions of consular posts"). In sum, there is every incentive to treat the background presumption as the reality in these cases - and no viable rationale for disregarding it.
 
 
 57
 The other very powerful reason for reaching this conclusion is that the State Department in substance supports it. As we have held in other cases, the State Department's view is entitled to substantial weight in treaty interpretation. See United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir.), stay denied, 520 U.S. 1206 (1997). This is true partly because the State Department negotiates and administers such treaties, but it is also true partly because, when foreign affairs are involved, the national interest has to be expressed through a single authoritative voice. That voice is the voice of the State Department, which in such matters speaks for and on behalf of the President.
 
 
 58
 The background presumption that treaties do not create privately enforceable rights and its corollary - that the State Department's view to this effect will receive respectful consideration -are extremely important principles that reverberate far beyond these cases. We believe that those principles warrant our adherence and our support.[1] This is especially so because, in a shrinking world, the number of treaties to which the United States is a party has proliferated. It is surpassingly difficult to accept the idea that, in most instances, either the Executive Branch or the ratifying Senate imagined that it was empowering federal courts to involve themselves in enforcement on behalf of private parties who might be advantaged or disadvantaged by particular readings of particular treaty provisions.
 
 
 59
 Our dissenting brother's emphasis on the self-executing character of the treaties in question does not sway our thinking. The label "self-executing" usually is applied to any treaty that according to its terms takes effect upon ratification and requires no separate implementing statute. See Restatement (Third) of Foreign Relations Law § 111(4) (1987). Whether the terms of such a treaty provide for private rights, enforceable in domestic courts, is a wholly separate question.[2] See id. at § 111, cmt. h. That courts sometimes discuss both concepts together, see, e.g., Committee of U.S. Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 937 (D.C. Cir. 1988), does not detract from their distinctiveness. At bottom, the questions remain separate. See id. at 937-38. It follows inexorably that the self-executing character of a treaty does not by itself establish that the treaty creates private rights.
 
 
 60
 We need go no further. There is an elaborate regime of practices and institutions by which the United States and other nations enforce commitments inter sese or decide that, in the national interest, promises given by or to another sovereign should not be enforced in a specific case. Sometimes this is done purely for reasons of prudence, sometimes for convenience, or sometimes to secure advantage in unrelated matters. Incalculable mischief can be wrought by gratuitously introducing into this often delicate process court enforcement at the instigation of private parties. We believe that such a course is to be avoided unless it can be said that private enforcement was clearly agreed to and envisioned by the contracting States in the treaties themselves. That is plainly not the case here.
 
 
 
 NOTES:
 
 
 [1]
 We do not gainsay that, on grounds of policy, there may well be reasons for Congress to give special private rights to foreign detainees above and beyond those conferred upon their American counterparts; the former are likely to enjoy fewer local advantages of language, resources, and friends. But the way remains open to such adjustments through domestic legislation enacted by Congress or, reciprocally, through treaties, negotiated by the State Department and ratified by the Senate, that explicitly provide for private judicial enforcement. No such intended adjustment can be found in the situation at hand.
 
 
 [2]
 The dissent relies on dictum from United States v. Alvarez-Machain, 504 U.S. 655, 667 (1992), for the proposition that treaties that are "self-executing" in the usual sense are necessarily enforceable in domestic courts at the behest of affected individuals. In that case, however, the nature of the right being asserted (which arose out of a claimed violation of an extradition treaty) was at least arguably personal, see United States v. Rauscher, 119 U.S. 407, 424, 430-31 (1886); see also United States v. Saccoccia, 58 F.3d 754, 767 n.6 (1st Cir. 1995) (discussing differing views of that issue), so the question of self-execution quite likely would have been decisive if the treaty had in fact been violated. To enlarge the Court's cryptic dictum into a general rule, contrary to the well-established principles discussed above, requires much too great a stretch.
 
 
 
 61
 TORRUELLA, Chief Judge (concurring in part; dissenting in part).
 
 
 62
 I concur with the majority opinion in affirming the judgment of conviction of appellants Hui Lin, Nai Fook Li, Yiu Ming Kwan, and Ju Lin. These appellants failed to preserve for appeal, their rights under Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, 596 U.N.T.S.261, 1967 WL 18349 (ratified November 24, 1969) (hereinafter "Vienna Convention") and Article 35 of the United States - People's Republic of China Bilateral Convention on Consular Relations, September 17, 1980, 33 U.S.T. 2973, 1982 WL 212240 (ratified February 19, 1982) (hereinafter "Bilateral Treaty"). See, e.g., Breard v. Greene, 118 S. Ct. 1352, 1354-55 (1998) (appellant procedurally defaulted his claim under the Vienna Convention by not raising and preserving the issue). However, such is not the case with respect to appellants Mao Bing Mu, Sang Li, and Ben Lin (hereinafter referred to collectively as the "appellants"). They did raise and preserve for appeal the issues before us regarding Article 36 of the Vienna Convention and Article 35 of the Bilateral Treaty. It is as to them and those issues that I respectfully disagree with my colleagues in the majority.
 
 
 63
 It is my view that the Government of the United States failed to comply with Articles 36 and 35, respectively, in not advising appellants upon their detention of their right to consular assistance. These provisions, once ratified by the Senate, constitute self-executing municipal law of the United States, which is individually enforceable in the courts of this country upon proper request by an affected detainee. Notwithstanding this conclusion, because the record has not been fully developed as to the possible prejudice that may have been suffered by appellants by reason of the violation of their rights, I would remand this case to the district court for an inquiry into these matters. Furthermore, if prejudice is found, the district court is initially in a better position to fashion a remedy, and I would thus defer to such a finding in the first instance.
 
 
 64
 Because such is my opinion, the thrust of my comments are directed to the first of the two issues for which the en banc court was convened: whether the Vienna Convention and/or the Bilateral Treaty create individual rights to consular notification and access that are enforceable by such individuals in court proceedings. Cf. Breard v. Greene, 118 S. Ct. at 1355 (the Vienna Convention "[a]rguably confers on an individual the right to consular assistance following arrest") (emphasis supplied).
 
 
 65
 I. Individual Rights Were Created By The Vienna Convention and The Bilateral Treaty
 
 
 66
 Although our Nation is one in which the rule of law is cherished in action as well as principle, and the maxim pacta sunt servanda has flourished, most courts facing claims such as are before us have side-stepped the enforcement of the rights established under the Vienna Convention and Bilateral Treaty, even in the face of finding a violation of treaty obligations entered into by the United States. See Faulder v. Johnson, 81 F.3d 515, 520 (5th Cir. 1996) ("Texas admits that the Vienna Convention was violated"); Breard v. Netherland, 949 F. Supp. 1255, 1263 (E.D. Va. 1996) ("Virginia's persistent refusal to abide by the Vienna Convention troubles the Court"). This Court has unfortunately chosen to follow suit.
 
 
 67
 The ensuing colloquy took place before the panel originally hearing this appeal:
 
 
 68
 The Court: Does it [the Vienna Convention] require that the individual be notified immediately?
 
 
 69
 Government Counsel: Well, yes it does. There is no question that this treaty was violated in this instance and the United States is not saying that it wasn't violated. We are simply saying that no court has granted a defendant any kind of relief in the absence of a showing of prejudice.
 
 
 70
 Oral Argument of April 6, 1999. Government counsel's frankness in admitting the obvious is commendable, although more recently the Justice Department seems to have retrogressed from this position, and, as is apparent from the majority opinion, the concessions made at oral argument are for naught.[1]
 
 
 71
 At least part of the majority's confusion stems from its basic misconception as to the nature of the rules that are before the Court. We are no longer merely considering international agreements to be administered or enforced at the discretion of the State Department, in which its interpretation as to applicability is entitled to special expertise or deference. Cf. United States v. Stuart, 489 U.S. 353, 369 (1989) ("[T]he meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight"). As will be further elucidated, once ratified by the Senate, both the Vienna Convention and the Bilateral Treaty became the municipal law of the United States pursuant to the Supremacy Clause,[2] and its provisions enforceable in the courts of the United States at the behest of affected individuals without the need for additional legislative action.
 
 
 72
 II. The Self-Execution of Treaties in the United States
 
 
 73
 In stating the "general rule" that treaties do not create individually enforceable rights, the majority completely ignores the well-established doctrine of self-execution. See, e.g., United States v. Green, 671 F.2d 46, 50 (1st Cir. 1982). I recognize that the interplay between the general rule and the doctrine of self-execution has been confused over the years, but that confusion stems from the failure to take into account the origins of the doctrine of self-execution as well as the reasoning that led to its creation. See generally Carlos Manuel Vazquez, The Four Doctrines of Self-Executing Treaties, 89 Am. J. Int'l 695, 699 (1995).
 
 
 74
 The general rule has its roots in English law. See J.G. Starke, Introduction to International Law 81-82 (10th ed. 1998); J.G. Collier, Is International Law Really Part of the Law of England?, 38 Int'l & Comp. L.Q. 924, 925-26 (1989) (citing The Parliament Belge, 4 P.D. 129 (1879)); see also Ware v. Hylton, 3 U.S. (3 Dall.) 256, 274-275, rev'd on other grounds, 3 U.S. (3 Dall.) 199 (1796). In the English system, treaties are entered into, and concluded, by the Crown without any intervention by Parliament. Consequently, treaties are ineffectual domestically without implementing legislation from Parliament.
 
 
 75
 Dissatisfaction with that system, and the anarchical consequence that binding treaties were often practically unenforceable, led our Founding Fathers to abandon the English system in favor of our Constitution's system of treaty negotiation by the Executive and ratification by the Senate. By its unambiguous text the Supremacy Clause declares treaties to be "the supreme Law of the Land", and thus automatically incorporates these international agreements into the domestic law of the United States, without the need for further action once the treaty is ratified by the Senate. The effect is to render treaty provisions enforceable in the courts at the behest of affected individuals, in applicable cases. See United States v. Alvarez Machain, 504 U.S. 655, 667 (1992) ("The Extradition Treaty has the force of law, and if... it is self-executing, it would appear that a court must enforce it on behalf of an individual regardless of the offensiveness of the practice of one nation to the other nation"); United States v. Puentes, 50 F.3d 1567, 1575 (11th Cir. 1995) (same). Contra Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 808 (D.C. Cir. 1984) (Bork, J., concurring) ("Treaties in the United States do not generally create rights that are privately enforceable in courts").
 
 
 76
 In one of the first cases to consider the applicability of the British rule under our constitutional system, the Supreme Court stated that:
 
 
 77
 In the United States a different principle is established. Our constitution declares a treaty to be the law of the land. It is consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision.
 
 
 78
 Foster v. Neilson, 27 U.S. (2 Pet.) 253, 314 (1829); cf. United States v. Perchman, 32 U.S. (7 Pet.) 51 (1833); see also Edye v. Robertson("Head Money Cases"), 112 U.S. 580, 598-99 (1884) ("A treaty, then is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined.")
 
 
 79
 Unfortunately, we are no longer in the same playing field that existed when the Court decided Foster and Perchman, whose holding has since been distorted beyond recognition with the tail end of the quoted language often wagging the principal rule established by those cases. Cf. Goldstar (Panama), S.A. v. United States, 67 F.2d 965, 968 (4th Cir. 1992); Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370, 373 (7th Cir.1985); Cardenas v. Smith, 733 F.2d 909, 918 (D.C. Cir. 1984); Tel-Oren v. Libyan Arab Republic, supra; British Caledonian Airways v. Bond, 665 F.2d 1153, 1160 (D.C. Cir. 1981); United States v. Postal, 589 F.2d 862, 874 (5th Cir. 1979).[3] The bottom line to these cases seems to be that we should look to the "intent" of the treaty to determine whether it is self-executing, or more in point, whether it creates rights that individuals can enforce in the courts. As the majority purports to recognize, however, we begin this inquiry with the terms of the treaty. See Alvarez-Machain, 504 U.S. at 366 (courts look first to a treaty's terms to determine its contents); Stuart, 489 U.S. at 365-66 ("the clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories'"). If we look to this guideline as the starting point to our inquest in the present appeal, I fail to see why further analysis is required or is appropriate.
 
 
 80
 III. The Text of Articles 36 and 35 of the Vienna Convention and Bilateral Treaty
 
 
 81
 Contrary to the majority's characterization, the language of the Vienna Convention and the Bilateral Convention is anything but ambiguous. Section 36(1)(b) unequivocally states that:
 
 
 82
 The... authorities shall inform the person [detained]... without delay of his rights [to consular notification and assistance].
 
 
 83
 (Emphasis supplied). This language, particularly that which I have emphasized, (1) mandates ("shall") action, (2) without delay, (3) by the detaining "authorities," which action is, (4) to "inform" the detained "person", (5) "of his," (6) "rights" to seek assistance from his consular representatives. This provision does not entail arcane or obscure parlance, or require the application of complex notions or of concepts that are difficult to understand or decipher. It simply requires a detaining authority in the United States, as soon as a foreign national is detained, to inform him or her of their right to request consular assistance with regards to the detention.
 
 
 84
 Were we dealing with such text in a statute originally enacted by Congress rather than this species of "Law of the Land," is there any doubt as to how this provision would be interpreted? We might very well quarrel, for example, as to how much time could pass after detainment before the failure to notify the alien of his/her rights was unreasonable, or there might be an issue as to whether there was a "detention" such as triggered the notification obligations imposed upon the authorities, or such other scenarios as are commonly litigated under similar doctrines, such as Miranda v. Arizona, 384 U.S. 436 (1966). But it is almost beyond cavil, were we faced with facts such as are presented by this appealed, with a statute reading as does Article 36, that the outcome would bepreordained. The authorities would be found to have violated appellants' rights in failing to inform them of their right to consular assistance while detained for approximately 50 days and shipped from one side of the globe to the other and back again.
 
 
 85
 In fact I have some difficulty envisioning how it is possible to frame language that more unequivocally establishes that the protections of Article 36(1)(b) belong to the individual national, and that the failure to promptly notify him/her of these rights constitutes a violation of these entitlements by the detaining authority. I must also confess to no small amount of bafflement, not to say disappointment, with the reluctance demonstrated by my colleagues in the majority, as well as other courts, in refusing to provide a forum for the vindication of what amounts to a confessed and flagrant violation of our national law by the Government. I would ask, what arena is more appropriate than the courts of the United States, for an individual to seek the validation of his/her rights against Governmental transgression of its own laws and regulations? See Fort Stewart Schs. v. FLRA, 495 U.S. 641, 654 (1990) (citing Vitarelli v. Seaton, 359 U.S. 535, 547 (1959), and Service v. Dulles, 354 U.S. 363, 388 (1957)). "Indeed, given that a treaty should generally be 'construed]... liberally to give effect to the purpose which animates it' and that '[e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred,'" Stuart, 489 U.S. at 368, I am at a loss to find rhyme or reason in the majority's conclusions.
 
 
 86
 The majority makes much of the preamble to the Vienna Convention, which states, inter alia:
 
 
 87
 The State Parties to the present Convention,
 
 
 88
 Believing that an international convention on consular relations, privileges and immunities would also contribute to the development of friendly relations among nations,... Realizing that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing states,
 
 
 89
 ....
 
 
 90
 Have agreed as follows.
 
 
 91
 23 U.S.T. at 3230 (emphasis supplied). The majority argues that the underscored language specifically excludes the claim of individual rights made by appellants. I find this a specious contention.
 
 
 92
 It is clear that in the context in which this provision is framed (e.g., "such privileges and immunities"), it refers to the privileges and immunities of "diplomatic agents" qua diplomatic agents, and not with respect to the individual rights established in Article 36(1)(b) for the benefit of detained nationals. See United States v. Rodrgues, 68 F. Supp. 2d 178, 182 (E.D.N.Y. 1999); see also Mark Kadish, Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Consul, 18 Mich. J. Int'l L. 565, 594 (1997).
 
 
 93
 I would add that reliance on this language to attempt to defeat appellants' claim of individual rights has an additional downside for those espousing this dubious position. If the inclusion of this language in the preamble to the Vienna Convention has the significance attributed to it, then the exclusion of this same wording from the preamble or text of the Bilateral Treaty with China, a specific accord on a similar subject which postdates the multinational Vienna Convention by thirteen years, should lead to the opposite conclusion, that is, it should mean that individuals do have such rights under the Bilateral Treaty. However such mental gymnastics are unnecessary, because the Bilateral Treaty's language is even more precise than that of the Vienna Convention in establishing individual rights.
 
 
 94
 Not only does the preamble of the Bilateral Treaty explicitly state as one of the goals of this treaty, "the protection of the rights and interests of their nationals...," (emphasis supplied), stated as a separate item from the goal of protecting the interests of the contracting nations, but Article 35(3) of this treaty precisely requires that:
 
 
 95
 The competent authorities of the receiving State shall immediately inform the national of the sending State of the rights accorded to him by this Article to communicate with a consular officer.
 
 
 96
 (Emphasis supplied). This explicit detailing of the obligation and concurrent right should require us to proceed no further in our recognition of appellants' claims. However, the majority's reliance on so-called "nontextual sources" and "legislative history" as support for its conclusions, forces us to reluctantly delve into that morass, notwithstanding the good advice that caution us to the contrary when statutory language is unambiguous. See Immigration & Naturalization Service v. Cardoza-Fonseca, 480 U.S. 421, 452 (1987) (Scalia, J. concurring) ("[I]f the language of a statute is clear, that language must be given effect... at least in the absence of a patent absurdity."). In any event, the "nontextual sources" and "legislative history" cited by the majority in actuality fully support appellants' contentions.
 
 
 97
 IV. The Background to Article 36 of the Vienna Convention
 
 
 98
 Of all the provisions of the Vienna Convention, the one with the "most tortured and checkered background is indubitably Article 36." See Luke Lee, Vienna Convention on Consular Relations 107 (1996). This provision was the subject of extensive and divisive debate before it was finally approved, with the differences centering mostly on the question of the foreign national's autonomy and rights under the proposed Article 36. Id. at 107-14; see also 1 United Nations Conference on Consular Relations: Official Records, at 3, U.N. Doc. A/Conf. 25/6, U.N. Sales. No.63.X.2 (1963) (hereinafter "U.N. Official Records").
 
 
 99
 The positions of the delegates from the United Kingdom and Australia were typical of the prevailing view. The former expressed his rejection of a proposal that a consul be notified only if the detained national so requested, because "[i]t could well make the provisions of Article 36 ineffective because the person arrested might not be aware of his rights." Id. at 83-84 (emphasis supplied); see also id. at 339, 344. The Australian delegate stated along a similar vein, that "[t]here was no need to stress the extreme importance of not disregarding, in the present or any other international document, the rights of the individual." Id. at 331 (emphasis supplied). In fact the United States delegate proposed an amendment to Article 36(1)(b) that the notification to a consul of a national's detention be made at the request of the national, "to protect the rights of the national concerned." Id. at 337 (emphasis supplied). From these and other statements by the various national delegates there should be little doubt that the treaty under consideration concerned not only consular rights but also the separate individual rights of detained nationals. Id. at 37 (statement of Soviet delegate); id. at 37, 82, 85, 339, 345 (statements of Tunisian delegate); id. at 38 (statement of Congolese delegate); id. at 339 (statement of Greek delegate); id. at 338 (statement of the Korean delegate); id. at 332, 344 (statement of Spanish delegate); id. at 81, 339, 340-01 (statement of the Indian delegate); id. at 82, 332 (statement of the French delegate); id. at 84 (statement of the Federal Republic of Germany); id. (statement of the delegate of Brazil); id. at 331 (statement of the delegate of Venezuela); id. at 332 (statement of the delegate of Kuwait); id. at 335 (statement of the Swiss delegate); id. at 336 (statement of the delegate of New Zealand); id. at 343 (statement of the delegate of Ecuador); see also Mark Kadish, Article 36 of the Vienna Convention on Consular Relations: A Search For the Right to Counsel, 18 Mich. J. Int'l L. 565 (1997) (discussing the Vienna Convention's history in this respect); Report of the United States Delegation to the United Nations Conference on Consular Relations, Vienna, Austria, March 4 to April 22, 1963 (hereinafter "U.S. Vienna Report").
 
 
 100
 During the course of the debate, the United Kingdom submitted the amendment to Article 36 that eventually became the final approved version of paragraph (b)(1), requiring the detaining nation to inform the detained foreign national of his/her right to consular access. The amendment was adopted 65 votes to 2, with 12 abstentions. The United States delegate voted in favor of the amendment. See U.S. Vienna Report at 60.
 
 
 101
 The Letter of Submittal of Secretary of State William P. Rodgers to the President dated April 18, 1969 is enlightening. In it Secretary Rodgers, in referring to Article 36(1)(b) indicates that:
 
 
 102
 It requires that authorities of the receiving State inform the person detained of his right to have the fact of his detention reported to the consular post concerned and his right to communicate with that consular post. If he so requests, the consular post shall be notified without delay.
 
 
 103
 (Emphasis supplied).
 
 
 104
 The U.S. Vienna Report, which is attached to the Letter of Transmittal states the following:
 
 
 105
 The solution adopted by the Conference to the problem of adjusting the notification obligations of the receiving State to the right of the individual concerned to request notification lies in the final sentence of subparagraph 1(b). That sentence requires authorities of the receiving State to inform the person detained of his right to have the fact of his detention reported to the consular post concerned and of his right to communicate with that consular post. This provision has the virtue of setting out a requirement which is not beyond means of practical implementation in the United States, and, at the same, is useful to the consular service of the United States in the protection of our citizens abroad.
 
 
 106
 (Emphasis supplied).
 
 
 107
 The Letter of Transmittal also includes the Report from the Committee on Foreign Relations reporting favorably on the Vienna Convention and recommending that the Senate give its advice and consent to the same. See Sen. Exec. Rep. 91-9, 91st Cong., 1st Sess. (1969). The Senate Report attaches the testimony of J. Edward Lyerly, the Deputy Legal Advisor for Administration before the Committee in which he states at the outset that "[t]he Convention is considered entirely self-executive and does not require any implementing or complementing legislation." (Emphasis supplied).
 
 
 108
 There is further evidence in actions taken by the State Department ante litigio, supportive of appellants' claims.[4] Much can be found in the Department's booklet entitled "Consular Notification and Access," a document instructing federal, state, and local law enforcement personnel regarding foreign nationals in the United States and their rights to consular notification and access.[5] See Government's Supplemental Appendix on Rehearing En Banc, Vol. II. Under the rubric of "Summary of Requirements Pertaining to Foreign Nationals," the first directive states that: "1. When foreign nationals are arrested or detained, they must be advised of the right to have their consular officials notified." Id. at 467. Later in this document there are "Suggested Statements to Arrested or Detained Foreign Nationals." Id. at 469. For example: "In all cases, the foreign national must be told of the right of consular access." Id. (emphasis in the original). This statement is repeated in like form on the next page. Id. at 472; see also id. at 477, 483, 484. The booklet also restate's Mr. Layerly's averment before the Senate to the effect that "[i]mplementing legislation is not necessary (and the Vienna Convention and bilateral agreements are thus "self executing") because executive, law enforcement, and judicial authorities can implement these obligations through their existing powers." Id. at 484 (emphasis supplied). Last but not least, the State Department thoughtfully provides a model "Consular Notification and Access Card" with the suggested statement to be made to the detained foreign national notifying him of his rights.
 
 
 109
 Not surprisingly, and I would add reassuringly to those of us that occasionally find ourselves outside the confines of our national borders,[6] the State Department vis-a-vis U.S. citizens arrested or detained in foreign lands,[7] takes a position similar to appellants in this case. In its Foreign Affairs Manual, the State Department indicates that "Article 36 of the Vienna Consular Convention provides that the host government must notify the arrestee without delay of the arrestee's right to communicate with the American consul." Id. at 378 (emphasis added). That said, and at the risk of stating what is obvious, I believe that the Government's position regarding the restricted application of the Article 36 (of the Vienna Convention) and Article 35 (of the Bilateral Treaty) rights of foreign nationals in the United States not only establishes a repugnant double standard but, considering more practical applications, sets up our many citizens abroad for abuses that we will be hard-put to object to, considering the tenor and outcome of the present appeal. See Gregory Dean Grisvold, Strangers in a Strange Land: Assessing the Fate of Foreign Nationals Arrested in the United States by State and Local Authorities, 78 Minn. L. Rev. 771, 792-94 (1994) (hereinafter "Strangers in a Strange Land").
 
 V. The Background to Article 35
 
 110
 The "legislative history" leading to the Bilateral Treaty with China is sparse. The Senate Report recommending its approval did state, however, that "[t]he bilateral consular convention will complement the multilateral Vienna Convention on Consular Relations of 1963 which is also in force between the two countries, but which treats certain important consular issues in only limited fashion." Sen. Exec. Rep. No. 97-14, 97th Cong., 1st Sess. (1981), at 2. Furthermore, I am astounded by the majority's contention that the Committee's failure to specifically note the individual right of consular notification somehow negates the clear language of Article 35.[8] As alluded to above, Article 35 of the Bilateral Treaty is even more emphatic and explicit than Article 36 of the Vienna Convention regarding the individual right of the national to notification of this entitlement by the detaining authority.
 
 
 111
 VI. The Interpretations of the Enforcement Authorities
 
 
 112
 Lastly we come upon the views of the enforcing authorities, that is, the ones that on a day to day basis are in the business of detaining and arresting persons, some of which are foreign nationals, and thus are charged with the practical implementation of Article 36 and Article 35. In this respect I should restate my view that once the pertinent treaty is ratified and thus incorporated into municipal law, the State Department should no longer be considered an "enforcing authority." The principal federal governmental entities fitting this description are the Department of Justice and the Immigration and Naturalization Service,[9] precisely the two "authorities" directly involved in appellants' detention and arrest. Both have explicit regulations respecting the issue before us, see 28 C.F.R. § 50.5; 8 C.F.R. § 236.1, both of which regulations were ignored with apparent impunity, and now, with judicial blessing, will continue to be transgressed per saecula saeculorum.
 
 
 113
 The INS regulation specifically requires that "[e]very detained alien shall be notified that he or she may communicate with the consular or diplomatic officers of the country of his or her nationality in the United States." 8 C.F.R. § 236.1(e) (emphasis supplied). The Department of Justice's regulation also requires that "[i]n every case in which a foreign national is arrested the arresting officer shall inform the foreign national that his consul will be advised of his arrest unless he does not wish such notification to be given."[10] 28 C.F.R. § 50.5(1) (emphasis supplied). Notwithstanding these regulations and their conceded violation by the detaining authorities, it appears that the majority is willing to carve out an exception, where aliens are concerned, to the well-established rule which demands of the Government compliance with its own regulations. See, e.g., Fort Stewart Schs. v. FLRA, 495 U.S. 641, 654 (1990) (citing Vitarelli v. Seaton, 359 U.S. 535, 547 (1959), and Service v. Dulles, 354 U.S. 363, 388 (1957)).
 
 VII. The Issue of Remedy
 
 114
 Finally, although my principal disagreement with the majority is over the Vienna Convention and the Bilateral Treaty's creation of individual rights, I must also take issue with their treatment of the question of remedy.[11] The majority holds that even if appellants have rights under Articles 36 and 35, they are not entitled to suppression of the wrongfully obtained evidence (or dismissal of the indictment) when the government violates those rights.[12] I would first say that whenever a court of the United States takes such a position, there is an inevitable erosion of the Judiciary as an institution. It is difficult to harmonize the principle of the rule of law with the granting of governmental immunity from the consequences of its violations of the Law.
 
 
 115
 The majority's "no remedy" rationale is based entirely on the conclusory assertion that "Article 36 of the Vienna Convention, and the complementary Article 35 of the Bilateral Convention, do not create--explicitly or otherwise--fundamental rights on par with the rights to be free from unreasonable searches, the privileges against self-incrimination, or the right to counsel." I disagree with that conclusion, and I believe that the issue at least deserves a more thorough examination than the cursory treatment afforded it by the majority.
 
 
 116
 As the majority notes, the exclusionary rule has been reserved for violations of fundamental rights such as those protected by the Fourth, Fifth, and Sixth Amendments. What the majority does not discuss, however, is what makes these rights "fundamental." In my view, we consider these rights fundamental not merely because they appear (along with others) in the Constitution, but because they are essential to the fair and efficient administration of our justice system.
 
 
 117
 Underlying the Sixth Amendment right to counsel, for instance, is the recognition that the ordinary criminal defendant is unqualified and ill-prepared to navigate the intricacies of our legal system without assistance. As the Supreme Court stated eloquently in Powell v. Alabama, 287 U.S. 45, 68-69 (1932):
 
 
 118
 Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.
 
 
 119
 Quoted in Gideon v. Wainwright, 372 U.S. 335, 345 (1963). The Court has also recognized a right to counsel at the investigatory stage of criminal proceedings, based on the Fifth Amendment's protection against compelled self-incrimination. See Miranda v. Arizona, 384 U.S. 436, 470 (1966) (noting that presence of counsel at interrogations can "mitigate dangers of untrustworthiness" and "help to guarantee that the accused gives a fully accurate statement to the police and that the statement is rightly reported by the prosecution at trial").
 
 
 120
 In my view, the right to consular notification and access responds to the same basic concerns for fairness and efficient administration of justice as does the right to counsel. The appellants in this case, for example, were detained by the United States half a world away from their homes. They spoke no English. They had no relatives or friends in the United States or any of the places where they were detained by U.S. authorities before being brought here. None had ever been to the United States before, and we must assume that none had any understanding of the American legal system. They very likely did not know that they had a right not to incriminate themselves and a right to be represented by counsel, nor even that they had a right to trial by jury.[13] In these unfamiliar circumstances, appellants were detained for nearly fifty days without counsel while they were shipped literally around the world, from Bermuda in the Atlantic, to Guantanamo in the Caribbean, to Wake Island and Hawaii in the Pacific, and finally to Boston.
 
 
 121
 It seems to me, under these circumstances, that consular notification and access are absolutely essential to the fair administration of our criminal justice system. Just as a lawyer guides a criminal defendant through the unknown territory of the justice system, diplomatic officials are often the only familiar face for detained nationals, and the best stewards to help them through the ordeal of criminal prosecution. A consular official offers two things of utmost importance to detained nationals: (1) the familiar background, language, and culture of the alien's homeland, and (2) a familiarity with the criminal system threatening to take away the alien's liberty. Without these aids, I think that we presume too much to think that an alien can present his defense with even a minimum of effectiveness. The result is injury not only to the individual alien, but also to the equity and efficacy of our criminal justice system.
 
 
 122
 Because I think the rights to consular notification and access incorporated into domestic law by the Senate's ratification of the Vienna Convention and the Bilateral Convention are fundamental to the fair and efficient administration of our justice system, I would hold that the exclusionary rule may be an appropriate remedy, at least where the defendant alien can demonstrate prejudice from the violation of his treaty rights.[14]
 
 VIII. Conclusion
 
 123
 In summary: (1) The Vienna Convention and the Bilateral Treaty are self-executing treaties which clearly grant detained individuals rights that are enforceable by them in the courts of the United States; (2) Both the text and "legislative histories" of these treaties, as well as subsequent action of the U.S. authorities support these conclusions; (3) Appellants have established that the authorities violated their rights under Articles 36 of the Vienna Convention and Article 35 of the Bilateral Treaty by failing to notify them of their right to consular assistance; (4) And the exclusionary rule may be an appropriate remedy for violations of these rights.
 
 
 124
 The contrary decision of this Court is unfortunate not only because it is legally unsupportable, but also because it will harm the credibility of our Nation internationally. Furthermore, it is short-sighted because it will undoubtedly adversely affect the rights of our citizens abroad.
 
 
 125
 For the reasons stated, I dissent.
 
 
 
 NOTES:
 
 
 [1]
 The chronology of events as to appellants was as follows:
 October 2: The M/V Xing Da was intercepted in international waters by the U. S. Coast Guard, and appellants were detained after boarding by Coast Guard personnel.
 October 9: Appellants were offloaded in Bermuda and flown to the U.S. Naval Base in Guantanamo, Cuba, where they continued to be held in detention and were interrogated by officers of the U.S. Immigration and Naturalization Service.
 October 19: Appellants were transferred to Wake Island and continued in detention.
 November 5: A superseding indictment was returned which included appellants.
 November 13: Appellants left Wake Island, still under detention.
 November 14: Appellants and witnesses arrived in Hawaii.
 November 15: Appellants were formally arrested.
 November 16: Appellants and witnesses arrived in Boston.
 November 18: 93 other passengers and crew were repatriated to China from Wake Island. A final superseding indictment was issued. Appellants had their initial appearance in Boston.
 November 20: Appellants were assigned counsel.
 At no point during this almost fifty-day ordeal were appellants notified of their right to consular notification and access.
 
 
 [2]
 U.S. Const. art. VI, cl. 2:
 This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
 
 
 [3]
 There are, of course, many treaties entered into by the United States regarding which even after Senate ratification, and thus "incorporation" as municipal law, the subject matter is such that individuals lack standing to base claims or defenses in a court of law. See Committee of United States Citizens Living in Nicaragua v. Reagan, 859 F.2d 929 (D.C. Cir. 1988). But such is not the present case.
 
 
 [4]
 I find the majority's reliance on positions taken by the State Department during litigation to be unpersuasive, particularly as those positions are both self-serving and directly contrary to the Department's nonlitigation position, as I describe above.
 
 
 [5]
 This booklet indicates that the instructions therein are based on legal obligations set forth in the Vienna Convention and bilateral treaties which "are binding on federal, state, and local government officials to the extent that are within such officials' competence", by virtue "Article VI, clause 2 of the Constitution of the United States." Id. at 471.
 
 
 [6]
 Millions of U.S. citizens travel abroad annually. In 1997 17,700,000 traveled to Mexico alone. The Time Almanac 2000, at 354. In that year 476,000 traveled to the People's Republic of China. Id. It is estimated that more than 3,000,000 U.S. citizens live abroad.
 
 
 [7]
 Over 2500 U.S. citizens are arrested abroad annually. See U.S. State Department, Bureau of Consular Affairs, Office of Overseas Citizens Services.
 
 
 [8]
 The committee report devotes barely half a page to its "Section-by-Section Analysis" of the entire Bilateral Treaty--hardly a comprehensive enumeration of the treaty's provisions.
 
 
 [9]
 Although INS is structured within the Department of Justice, it has its own regulation regarding the arrests of aliens. 28 C.F.R. § 50.5(b).
 
 
 [10]
 Some treaties require notification to the consul irrespective of the individual's wishes.
 
 
 [11]
 I would emphasize that the ordinary course of proceedings is for the trial court to make a determination of remedy in the first instance. I think that the majority's side-stepping of the ordinary process in this case to avoid the treaties' clear statement of individual rights is ill-advised, and I would remand the case to the district court to address the issue of remedy if prejudice is first found. However, because the majority hangs its hat on the remedy issue, I will address it briefly.
 
 
 [12]
 Although I interpret the majority opinion to reach only the narrow question of whether these two remedies--suppression and dismissal--are available, particularly in view of the position taken by the concurrence I cannot agree with the majority's conclusion.
 
 
 [13]
 This lack of familiarity is exacerbated when the detained aliens, like appellants, come from countries with vastly different legal and political systems, some of which have little or no recognition of the individual rights that we deem fundamental. See Strangers in a Strange Land, supra.
 
 
 [14]
 I would be more hesitant to sanction the much harsher remedy of dismissal, although I would not rule out such a remedy in extreme cases, such as willful or deceptive denial of consular access.