**Benjamin Trinidad TRUJILLO,
Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 09–97–528CR.**

Court of Appeals of Texas,
Beaumont.

Submitted Sept. 16, 1999.

Decided Jan. 26, 2000.

George E. Renneberg, Law Offices of William E. Hall, Jr., Conroe, for appellant.

Michael A. McDougal, Dist. Atty., David Bluestein, 1st Asst. Dist. Atty., Jay Hileman, Asst. Dist. Atty., Gail Kikawa McConnell, Asst. Dist. Atty., Peter C. Speers, III, Asst. Dist. Atty., Conroe, for state.

## OPINION

STOVER, Justice.

A jury convicted appellant Benjamin Trujillo ("Trujillo") of the murder of Joseph Sanchez and assessed a punishment of twenty years of confinement in the Texas Department of Criminal Justice, Institutional Division. Contending the trial court erred in denying his motion to suppress, Trujillo raises a single issue on appeal concerning the trial court's failure to exclude two written statements from evidence at trial.

### STANDARD OF REVIEW

 We review a decision on a motion to suppress under an abuse of discretion standard. *See Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997). Thus, we afford deference to the trial court's determination of the historical facts, but we review *de novo* the trial court's determination of the applicable law, as well as its application of the appropriate law to the facts it has found. *See State v. Rutherford,* 1999 WL 815682 Tex.App.—San Antonio Oct. 13, 1999, no pet. h.) (citing *Guzman,* 955 S.W.2d at 89). "In a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony." *State v. Ballard,* 987 S.W.2d 889, 891 (Tex.Crim.App.1999). In reviewing the trial court's decision, an appellate court views the evidence in the light most

favorable to the trial court's ruling. *See id.; Guzman,* 955 S.W.2d at 89. If no findings of fact are made on an issue, then the court of appeals is required to imply all necessary fact findings that would support the trial court's ruling. *See State v. Terrazas,* 4 S.W.3d 720, 725–26 (Tex.Crim.App. 1999). Furthermore, the court of appeals is required to defer to these implied findings that the record supports especially when these findings are based on an evaluation of credibility and demeanor. *Id.*

## BACKGROUND FACTS

During the investigation of the murder, Trujillo twice gave the police written statements indicating he shot his employer, Joseph Sanchez, at Sanchez's place of business. According to Trujillo's last statement, Sanchez had been harassing him at work for approximately three weeks prior to the murder. After arriving at work on March 5, 1997, Trujillo stated that while he was sweeping around the office desk, he saw a gun. Trujillo indicated he picked up the gun and intended to scare Sanchez in the hope that he (Sanchez) would stop insulting him. According to Trujillo, when Sanchez walked in, the gun went off. The import of both of Trujillo's statements is that the shooting was accidental.

## ANALYSIS

The basis for Trujillo's motion to suppress is the State's alleged violation of a provision of the Vienna Convention treaty. Specifically, he contends the two written statements were taken in violation of his rights under Article 36(1)(b) of the Vienna Convention on Consular Relations, which provides as follows:

> [I]f he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in

any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody[,] or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph....*

Vienna Convention on Consular Relations (Vienna Convention), Apr. 24, 1963, art. 36(1)(b), 21 U.S.T. 77 (ratified by the United States on Nov. 24, 1969) (emphasis added). The provision requiring that a person be notified of his rights under the treaty is not triggered unless the person is a foreign national who has been "arrested or committed to prison or to custody pending trial or is detained in any other manner."

Trujillo contends Texas authorities are obligated to act in conformity with Article 36 unless some statute, regulation, rule, or treaty permits Texas to do otherwise. He points out that since Tex.Code Crim. Proc. Ann. art. 38.23 (Vernon Supp.2000) requires the exclusion of evidence obtained in violation of any provision of a constitution or of federal or state law, the two written statements must be excluded from evidence, since they were obtained in violation of a provision of a treaty to which the United States is a signatory.

The Court of Criminal Appeals recently commented on the Vienna Convention treaty and its application:

> Article 38.23(a) provides that evidence obtained in violation of a federal or state law or constitutional provision shall not be admitted against the accused and mandates that the jury be instructed to disregard evidence obtained in violation of the law if the issue is raised by the evidence. Under the Supremacy Clause of the United States Constitution, states must adhere to United States treaties and give them the same force and effect as any other federal law. U.S. Const. Art. VI, cl. 2; ... *see also Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998). Thus, a

violation of this treaty would arguably fall under the language in Article 38.23(a) if the issue is raised by the evidence. *Compare Cardona v. State,* 973 S.W.2d 412, 417–18 (Tex.App.—Austin 1998[, no. pet.]) (finding violation of treaty merited exclusion of evidence under Article 38.23(a), but holding error did not affect defendant's substantial rights).

*Maldonado v. State,* 998 S.W.2d 239, 247 (Tex.Crim.App.1999). As evidenced by the treaty provision, a foreign national who has been arrested, imprisoned, or taken into custody has a right to contact his consulate. *See id.* at 246. Furthermore, the arresting government authorities are required to inform the individual of this right "without delay." *Id.* at 246–47; *see* Vienna Convention, art. 36(1)(b).

■ As we appreciate the language in *Maldonado,* a foreign national "arrested or committed to prison or to custody pending trial or detained in other manner" has certain rights under the Vienna Convention treaty. We first consider whether Trujillo was a foreign national. The trial court made no finding regarding citizenship; therefore, a finding of United States citizenship or a finding that Trujillo is not a foreign national is implied. *See Terrazas,* at 725–26. Such a finding, however, has no basis in the record and represents a misapplication of the law to the facts.

The State takes the position that informing Trujillo of a right under the treaty was not required, because the record does not show Trujillo was a foreign national. In support of its position, the State directs us to the facts surrounding the citizenship issue in *Maldonado.* There the Court of Criminal Appeals concluded the evidence showed at least a possibility that Maldonado was a United States citizen.

> Only if appellant is a foreign national did authorities have an obligation to notify him of his right to consular access. Testimony at trial showed that appellant lived in Mexico when he was a child and that is where he knew the victim's son.... This evidence does not preclude the possibility that appellant became a United States citizen after coming to this country. Other evidence showed appellant had lived in the United States for many years, spoke some English, had a Texas driver's license, and had purchased a car in the United States. No one testified that applicant was not a United States citizen. In sum, trial evidence did not show appellant was a Mexican citizen.

*Id.* at 247. According to *Maldonado,* the evidence of the possibility of citizenship precluded the finding of a violation of the treaty.

Unlike the record in *Maldonado,* however, the evidence in the instant case does not, under the law, demonstrate the possibility of citizenship. At the hearing on Trujillo's motion to suppress, the following testimony was elicited during cross examination of Elias Perez, an investigator with the Conroe police department:

Q (Defense counsel): Okay. Back to the point in time while you're at Mr. Trujillo's residence on the 7th, you have given him the oral warning of his [*Miranda*] rights; is that correct?

A (Perez): I've asked him if his rights have ever been read.

Q And you didn't read him any more rights.

A No, sir.

Q Do you know whether or not Mr. Trujillo is a Mexican National?

A Yes, I do.

Q Is he a Mexican National?

A He advised that he was born in Mexico.

Q .... [I]s there anything in any of the forms up there that you have where Mr. Trujillo was advised that as a Mexican National, that he had a right to consult with his Mexican Consul if he wanted to?

A No, sir.

Q Did you ever advise him of that orally at any time?

A No, sir.

We apply the analysis in *Maldonado* to the instant case. Here there was evidence from both Officer Perez and Trujillo that Trujillo was born in Mexico and had lived there before coming to the United States. He testified he had been in Conroe, Texas, for approximately four years. Applying the law regarding residence and naturalization to the facts of the case, we look first to the applicable statute:

### § 1427. Requirements of naturalization

#### (a) Residence

No person, except as otherwise provided in this subchapter, shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least *five* years....

8 U.S.C. § 1427(a) (1999) (emphasis added). Under federal law, a person seeking to become a United States citizen must have lived here for at least five years. There is no evidence to that effect in the record. Indeed, the record reveals Trujillo's residency to be only four years.

Another requirement for becoming a United States citizen is the ability to read, write, and speak the English language; the applicable statute is set out below:

### § 1423. Requirements as to understanding the English language, history, principles and form of government of the United States

(a) No person except as otherwise provided in this subchapter shall hereafter be naturalized as a citizen of the United States upon his own application who cannot demonstrate—

(1) an understanding of the English language, including an ability to read, write, and speak words in ordinary usage in the English language: *Provided,* That the requirements of this paragraph relating to ability to read and write shall be met if the applicant can read or write simple words and phrases to the end that a reasonable test of his literacy shall be made and that no extraordinary or unreasonable condition shall be imposed upon the applicant....

8 U.S.C. § 1423(a)(1) (1999). There is no evidence in the record of the suppression hearing that Trujillo could speak, read, or write English. Although Officer Perez testified he did not know whether Trujillo spoke any English, Perez also indicated he addressed Trujillo only in Spanish. Trujillo himself testified he speaks only Spanish and no English; Trujillo's testimony on that issue was uncontradicted. Furthermore, the forms Trujillo read and signed at the police station were in Spanish, as were the two written statements he made for the police. At the suppression hearing, an interpreter was present to interpret the proceedings into Spanish.

In order to become a naturalized citizen, the law requires that a person be able to read, write, and speak English. The trial court's implied finding that Trujillo had such an ability demonstrates an incorrect application of the law to the facts. We conclude that a correct application of the law to the facts reveals there is no possibility of Trujillo's being a United States citizen.

■ We turn next to the requirement under the Vienna Convention treaty that the foreign national must be someone who is "arrested or committed to prison or to custody pending trial or is detained in any other manner." According to Officer Perez, four officers—two detectives and two uniformed officers—went to Trujillo's apartment to question him on March 7, 1997. Perez asked Mrs. Trujillo if they could enter the apartment and talk to her husband. She agreed, and all four officers entered the apartment. According to Perez, the officers had gone there to question Trujillo about "a lunch meal," cassette

tape, and Spanish Bible, all identified as being connected to Trujillo, that were found at the crime scene two days after the murder. Officer Perez testified that as soon as he mentioned the three items, Trujillo began to perspire and his upper body began to sway. The officer asked him to sit down because he was concerned Trujillo "might collapse or fall down."

At the police officers' request, Trujillo accompanied them in a patrol car to the police station where he was questioned further. According to Officer Perez, Trujillo accompanied them voluntarily, although Trujillo testified at the motion to suppress hearing he was forced to go. During the conversation at the police station, but before Trujillo gave his first written statement, Trujillo inquired about conditions at the Montgomery County jail and also asked how he could "go about getting an attorney." Officer Perez indicated he described the jail conditions to him and also informed him that "when you're charged with a charge, you will be appointed [an attorney]." Perez further told Trujillo that if he wanted an attorney Perez would have to discontinue the discussion with him. According to Perez, Trujillo assured him he did not want an attorney whereupon the conversation between Officer Perez and Trujillo continued. According to Perez, Trujillo at one point stated, "[T]he truth will finally come out. I'm tired of just going around in circles...." At that point, Trujillo's wife and other officers came in the room. Both oral and written *Miranda* warnings were given to Trujillo in Spanish, and a tape was then made of his oral statement. Perez testified that after Trujillo made the oral recorded statement, Perez suspected Trujillo of being involved in the murder. Trujillo was again given *Miranda* warnings, and he then made a written statement. After the written statement was completed, Perez testified Detective Roper arrived with a warrant. According to Perez, Trujillo was free to leave until Detective Roper returned with the arrest warrant.

Trujillo made the second written statement six days later. After his arrest on March 7, he was taken to jail. According to Perez, Trujillo stated he would be willing to take a lie detector test, and one was scheduled for March 13. The polygraph examiner testified that during his pre-interview with Trujillo, the accused asked to make another statement. Again Trujillo was given *Miranda* warnings, and the second statement was made. The State acknowledged that Trujillo was not informed of his rights under the Vienna Convention treaty at any point either before or after the two written statements were made.

■ Although we defer to the trial court regarding the determination of the historical facts, we review *de novo* such legal concepts as detention and reasonable suspicion. *See Hunter v. State*, 955 S.W.2d 102, 105 n. 4, 107 (Tex.Crim.App.1997). As we read the provisions of the Vienna Convention treaty, Trujillo fell within the final, more expansive category of being "detained in another manner." Although he may not have been under arrest or in custody, and certainly was not committed to prison when he went to the police station, he was nonetheless "detained in another manner" by the time he finished making his recorded oral statement on March 7. This court has in the past stated that a voluntary accompanying of an officer by an individual to discuss a fresh, non-focused investigation is not custodial. *See Malone v. State*, 882 S.W.2d 945, 950 (Tex.App.—Beaumont 1994, no pet.). We do not hold to the contrary now. However, the investigation here was not a "non-focused one"; clearly, the investigation had shifted to focus on Trujillo, once his personal items were found at the scene. The unfolding events at the police station escalated from what the State contends was a mere voluntary accompaniment to the station into a detention.

Although the trial court found the statements were voluntary, the facts belie that application of the law. Under the facts herein, a reasonable person, particularly a

foreign national in the circumstances herein, would not have felt free to walk away from the police station after giving his oral recorded statement. *See generally Hunter*, 955 S.W.2d at 104 (The dispositive question is whether the officers conveyed a message to appellant that compliance with their requests was required.) In spite of the officer's claim that Trujillo was free to leave, a correct application of the law to the facts would dictate otherwise. Once Trujillo, a foreign national who spoke no English, inquired about jail conditions and obtaining an attorney, informed the police that he wanted to make a statement because "the truth [would] finally come out," and then made a recorded oral statement, the encounter had escalated into the category of being "detained in any other manner." In applying the law to the facts, we conclude the "detention" required for invocation of the protective provisions of the Vienna Convention treaty was met.

■ Because his statements were made without his being accorded his rights under the Vienna Convention treaty, Trujillo contends the statements fall within the purview of TEX.CODE CRIM. PRO. ANN. art. 38.23(a) and must be excluded. In considering the relationship between a violation of the treaty and art. 38.23(a), the Court of Criminal Appeals stated in *Maldonado* that "a violation of this treaty would arguably fall under the language in Article 38.23(a) if the issue is raised by the evidence." *Id.* at 247. Under our review of the record and analysis of the law, a violation of the treaty was raised by the evidence, and Trujillo's two pre-trial statements should have been excluded from evidence at trial. Because they were not, the trial court erred in overruling Trujillo's motion to suppress.

### HARM ANALYSIS

■ We now turn to a determination of whether such error is reversible under TEX.R.APP. P. 44.2. Trujillo does not claim on appeal that a constitutional error was committed by the trial court; instead, the gravamen of his complaint is that his statements were obtained "in violation of a United States treaty" and were "used in a court in violation of a Texas statute [art. 38.23] over the timely objection of Appellant prior to trial...." He further maintains his written statements, which were both admitted at trial, "were instrumental in convicting" him. Although numerous witnesses testified at trial, he contends none of them "could inculpate [him]." "Only the officer who took statements from [Trujillo] ... could connect [him] with the crime...."

In a case with similar issues, *Cardona v. State*, 973 S.W.2d 412 (Tex.App.—Austin 1998, no pet.), the Austin court of appeals was confronted with allegations of a violation of the Vienna Convention treaty. Like the appellant in the instant case, Cardona, a Mexican national, filed a motion to suppress statements he had made to the State's investigator prior to trial. *Id.* at 414. Because the State failed to inform Cardona without delay of his right to access the Mexican consulate, the appellate court concluded the treaty was violated and then proceeded to perform a harm analysis under TEX.R.APP. P. 44.2(b). *Id.* at 417–18.

**44.2 Reversible Error in Criminal Cases.**

. . . .

(b) *Other Errors.* Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

We conduct a similar analysis in the instant case and conclude, under the record herein, that Trujillo's substantial rights were affected.

The evidence at trial was entirely circumstantial. No one saw or heard Trujillo at the shop around the time of the murder. No fingerprints were found on the gun. Officer Davis testified there may have been some prints made at the crime scene, but he was not sure; none were offered into evidence. Atomic absorption tests

were performed on Trujillo, Joseph Sanchez, the deceased, and Mario Sanchez, the deceased's brother, to detect any gun powder residue on their hands. No test results were offered into evidence. The murder occurred on March 5, 1997. Two days later, on March 7, investigators found a Bible, a cassette tape, and a lunch, all purportedly belonging to Trujillo, at Sanchez's place of business. Officer Perez, who did not become involved in the case until March 7, testified he did not know if those items were at the shop on March 5. "We didn't see them on the 5th . . . ." Darlene Sanchez, wife of the deceased, testified she had no knowledge of any problems between her husband and Trujillo. Mario Sanchez testified there might have been a misunderstanding between his brother and Trujillo, but he also acknowledged he never heard his brother "counsel" Trujillo about his work. According to Mario, his brother had fired Trujillo some two and a half years ago. However, Trujillo was working at the shop at the time of the murder.

After examining the record as a whole, we find there is a paucity of evidence, all of which is circumstantial, connecting Trujillo to the crime. Trujillo's written statements, which were admitted into evidence at trial, not only connect him to the murder, but they also establish he shot Sanchez, a fact which is not established by any other evidence. We are, therefore, unable to say with fair assurance that the erroneous admission of Trujillo's statements did not influence the jury, or had but a slight effect, or that their admission did not affect appellant's substantial rights. *See Johnson v. State*, 967 S.W.2d 410 (Tex. Crim.App.1998). We find the trial court abused its discretion in denying the motion to suppress, sustain appellant's issue, reverse the trial court's conviction, and remand this case for a new trial.

REVERSED AND REMANDED.

RONALD L. WALKER, Chief Justice, concurring.

I concur with the result reached by the majority. Since, however, Article 38.23 is implicated by the police having failed to inform appellant of the provisions of the Vienna Convention, an "attenuation of taint" analysis must also be done. *See Johnson v. State*, 871 S.W.2d 744, 750–51 (Tex.Crim.App.1994).

An attenuation analysis is conducted under the provisions announced in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), with no one factor being dispositive of the inquiry. *Johnson*, 871 S.W.2d at 751. It is uncontested that prior to the taking of both statements, appellant was provided with his *Miranda* warnings. This fact mitigates in favor of the State. However, unlike analyses in which the "taint" involves an illegal arrest or improper search and/or seizure which, in turn, involve *acts* that have a definite beginning and ending, in the instant case we are presented with a continuing *omission* on the part of the authorities. This continuing omission is the tainting "event" upon which the remaining *Brown* factors are analyzed. Indeed, with regard to the next two *Brown* factors, (temporal proximity of the tainting event and the statements, and presence of intervening circumstances), the fact that appellant was continually unaware of his right to consult with a consular representative from Mexico at the point he was detained, I believe, fatally mitigates against the State.

The temporal proximity factor is based upon the reasoning that the shorter the time between the tainting event and the taking of the statement the more likely the tainting event has not been purged. *See Maixner v. State*, 753 S.W.2d 151, 156 (Tex.Crim.App.1988). In the instant case, however, the tainting "event" is continual; appellant is *never* made aware of the provisions of the Vienna Convention. Therefore, the tainting "event" is never purged. Likewise with the "presence of intervening circumstances" factor. Because the tainting "event" is continual no circumstances can possibly intervene because appellant's

statements are taken in the midst of the continual tainting "event." Again, no purging can take place as the tainting "event" is continuing. Obviously, the impossibility of any purging of the tainting "event" to take place under factors two and three is enough to find no attenuation has taken place.

The fourth factor, the purpose and flagrancy of the official misconduct, in my view, also mitigates against the State in that, while the purpose of the omission is not clear from the record before us, the fact that appellant was never informed of the Vienna Convention provisions speaks for itself as to flagrancy of the misconduct.[1] I conclude, therefore, that the State failed in its burden to show, by clear and convincing evidence, that the continuing taint of failing to inform appellant of the provisions of the Vienna Convention did not infect the incriminating statements taken from appellant following his detention. *See Boyle v. State*, 820 S.W.2d 122, 131–32 (Tex.Crim.App.1989), *overruled on other grounds by Gordon v. State*, 801 S.W.2d 899, 911 n. 3 (Tex.Crim.App.1990). I concur with the majority's decision to reverse and remand the instant case.

---

1. In using the phrase "flagrancy of the misconduct" I do not mean in any way to infer that the police personnel involved in the instant case acted unprofessionally or exhibited any animus toward appellant during his detention and interrogation. While courts of this State have long held that all persons, including law enforcement personnel, are presumed to know the law, *see Hayes v. State*, 672 S.W.2d 246, 248 (Tex.App.—Beaumont 1984, no pet.), *citing Crain v. State*, 69 Tex. Crim. 55, 153 S.W. 155 (1913), I realize that the existence of the provisions of the Vienna Treaty in question may have been something new to the police personnel in the instant case. I use the phrase "flagrancy of the misconduct" only because that is the phrase used by the Court in *Brown*, and not to indicate any malice on the part of the police personnel toward appellant.