[Nos. 44626-6-I; 44896-0-I. Division One. April 2, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. EDGAR GECA JAMISON, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. JOSE WILMER ACOSTA, *Appellant*.

---

[36] RCW 4.84.340(1).

[37] *See* RCW 84.08.010.

574

*Nicholas W. Marchi* (of *Carney & Marchi*), for appellant Jamison.

*Thomas M. Kummerow* (of *Washington Appellate Project*), for appellant Acosta.

*Norm Maleng, Prosecuting Attorney*, and *James M. Whisman, Deputy*, for respondent.

KENNEDY, J. — Jose Acosta and Edgar Jamison appeal their respective felony convictions, contending that custodial statements obtained by police without informing them of their rights as foreign nationals under the Vienna Convention on Consular Relations (Vienna Convention) mandates suppression of those statements. Acosta claims that the trial court erred in failing to suppress his custodial statement to the police because he was not informed of his right under the Vienna Convention to contact the Honduran Consulate. Jamison, whose Vienna Convention claim is presented in the context of a claim of ineffective assistance of counsel at the time of his guilty plea, contends that the trial court erred when it denied his motion to vacate judgment and sentence. He argues that his attorney denied him effective assistance during the plea process by failing to move to suppress his custodial statements on the basis that he was not informed of his right to contact the Philippine Consulate. As another basis for his ineffective assistance of counsel claim, Jamison contends that his guilty plea was involuntary because his attorney failed to inform him that he definitely would be deported following his conviction and that he would not be allowed reentry into the United States.

The consolidated issue regarding a foreign national sus-

pect's rights under the Vienna Convention will be addressed before discussing Acosta's and Jamison's individual claims.

## VIENNA CONVENTION

Under Article 36 of the Vienna Convention, of which the United States, Honduras and the Philippines are member nations, consular officials and nationals from their respective sending states are free to communicate with and to have access to one another. Article 36 states that "[w]ith a view to facilitating the exercise of consular functions relating to nationals of the sending State:"

. . . .

[If the foreign national] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.

Vienna Convention on Consular Relations, Apr. 24, 1963, art. 36(1)(b), 21 U.S.T. 77, T.I.A.S. No. 6820 (entered into force for the United States Dec. 24, 1969).[1] Article 36 also provides that "consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation." *Id.*, art. 36(1)(c).

 The obligations of consular notification and access

---

[1] In addition to the Vienna Convention, the United States and the Philippines are parties to a bilateral convention under which notification of detention of nationals of either country is mandatory and must be made immediately to consular officers, whether or not the foreign national requests that such notification be made, and even if the foreign national objects to such notification. *See* Consular Convention, Mar. 14, 1947, U.S.-Phil., art. VII, para. 2, 11 CHARLES I. BEVANS, TREATIES AND OTHER INTERNATIONAL AGREEMENTS OF THE UNITED STATES OF AMERICA, 1776-1949, at 74 (1976).

are binding on states and local governments, as well as the federal government. See Article VI, Clause 2 of the United States Constitution which provides that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." *See also United States v. Arlington County*, 669 F.2d 925 (4th Cir. 1982). The State does not contest that Article 36 of the Vienna Convention was violated when the appellants were not informed of their rights to contact their respective consulates. We must decide whether suppression of custodial statements made by such foreign nationals is an appropriate remedy for violation of the provisions of Article 36 of the Convention.

Division Three of this court recently addressed this issue in *State v. Martinez-Lazo*, 100 Wn. App. 869, 999 P.2d 1275, *review denied*, 142 Wn.2d 1003 (2000). In the context of an ineffective assistance of counsel claim, the court held that suppression is not a remedy available to a foreign national who was not advised of his rights under Article 36 of the Vienna Convention before he made incriminating statements to law enforcement officers. *Id*. at 875 (citing *United States v. Lombera-Camorlinga*, 206 F.3d 882 (9th Cir.) (en banc), *cert. denied*, 531 U.S. 991 (2000); *United States v. Nai Fook Li*, 206 F.3d 56 (1st Cir. 2000) (en banc)).

The *Martinez-Lazo* court based its ruling entirely on *Lombera-Camorlinga* and *Li*. Before deciding *Li*, the First Circuit Court of Appeals posed a series of questions to the Department of State, one of which requested the Department's "exact position on the question whether such treaties [as the Vienna Convention and a bilateral consular convention between the United States and China containing mandatory notification provisions similar to those contained in the bilateral agreement between the United States and the Philippines] may be invoked by defendants in criminal cases." Department of State Answers to the

Questions Posed by the First Circuit in *United States v. Nai Fook Li* (Answers) at A-1.

We have studied the Answers in connection with this appeal. By way of summary of their content, the State Department is of the view that neither the Vienna Convention nor any of the bilateral consular conventions to which the United States is a party require that violation of consulate notification obligations be remedied through the criminal justice systems of the member states. Answers at A-1. Indeed, in the view of the State Department these treaties do not establish rights of individuals at all, but rather state-to-state rights and obligations relevant to the conduct of consular relations. *Id.* at A-3. Violations are remedied through diplomatic and political means and, where member nations have so agreed by becoming parties to an optional protocol of the Vienna Convention, before the International Court of Justice. *Id.* at A-3, A-10. In addition, the Department of State has undertaken intensive outreach in order to inform federal, state and local law enforcement officials of their obligations under the treaty, which has resulted in improved compliance. *Id.* at A-6.[2]

█ The accepted tools of treaty interpretation include the text of the treaty, its negotiation history, its Congressional legislative history, and the past practices of member states operating under the treaty. *Id.* at A-4, A-9.

The language in Article 36 requiring detention authorities to "inform the person concerned without delay of his rights" to consular notification and access was negotiated in order to facilitate consular functions, and not to bestow rights that can be raised by the individual as a basis for relief in criminal court. *Id.* at A-4, A-6. The obligation to inform the foreign national of his or her right to communicate with his or her consulate is not an end in itself, but rather a mechanism to deal with the possibility that the

---

[2] As part of its outreach efforts, the Department has issued a booklet entitled Consular Notification and Access, and subtitled Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist Them. The full text of this booklet is available at *http://www.state.gov*. We commend the booklet to all prosecuting attorneys and police agencies in this state.

individual being detained might not know of this right, and was the result of a compromise by negotiators after mandatory notification was rejected. *Id.* at A-6.

There is no reason to believe that Congress, in ratifying the treaty, intended any significant changes in the criminal process; instead, there is reason to believe to the contrary, in that both Congress and the governors of the several states were advised by the State Department that ratification of the Vienna Convention would require no significant changes in the practices of the several states. *Id.* at A-9. Moreover, subsequent treaties have been consistent with this expectation, namely, the treaties between the United States and Mexico and the United States and Canada on the execution of penal sentences. These treaties provide for American citizens who have been convicted of crimes in those two countries to serve their sentences in the United States, which sentences must be served whether or not the citizens were notified of their rights under Article 36 in the host country. *Id.* at A-5, A-6.

Finally, no member state of the Vienna Convention or any bilateral consulate convention has ever provided remedies for violations of Article 36 through its domestic criminal justice system, and courts in Italy and Australia have specifically rejected requests from foreign nationals for that kind of relief. *Id.* at A-8, A-9. Neither has the Department of State ever requested such relief for United States citizens being detained abroad, nor any other kind of judicial relief, for that matter. Instead, the Department instructs its consular officials stationed abroad to continually seek improved host-country compliance and to work directly with host government officials to ensure that they are aware of their responsibilities under the Vienna Convention when citizens of the United States are detained in their countries. *Id.* at A-5.

■ "While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight." *Kolovrat v. Oregon,* 366 U.S.

187, 194, 81 S. Ct. 922, 6 L. Ed. 2d 218 (1961). The State Department was charged with negotiating and is charged with enforcing the Vienna Convention and the bilateral agreements that exist between the United States and various other nations. *Li*, 206 F.3d at 67. Moreover, the Answers are consistent with positions taken by the Department in litigation before the International Court of Justice and the Inter-American Commission on Human Rights in at least two death penalty cases in which the defendants had not been advised of their rights to contact their respective consulates. Answers at A-2 n.2, n.3. In one of those cases, Vienna Convention on Consular Relations (Para. v. U.S.), 1998 I.C.J. 426 (Nov. 10), the Department advised the court that a number of practical difficulties would arise from attempting to remedy consular notification violations through the criminal justice system. The Department opined that a bright-line rule suppressing all evidence subsequent to the violation would lead to absurd results, and a rule requiring a finding of prejudice before suppression would be highly problematic. Answers at A-4. This is because courts would necessarily encounter a number of practical difficulties in trying to determine whether a particular consulate would have provided meaningful assistance if notice had been given. First, there is a wide variation in consular assistance provided by different countries. Some consuls provide no meaningful assistance whatsoever, and there is no requirement in the Convention that they provide any assistance, in any event. *Id.* Determining whether a particular consulate would have provided meaningful assistance if notified would be highly speculative, in that the inviolability of consular archives would hinder a full and fair exploration of the issue. *Id.* Foreign governments could be embarrassed by judicial determinations that there was no prejudice to a given defendant because his or her consulate would have rendered no meaningful assistance if notice had been given as required by Article 36, and our own government could be embarrassed by judicial determinations that the treaty was violated while the Department, following its own investigation of the alleged violation,

might be taking the position in the course of diplomatic communications that the treaty had not been violated. *Id.* at A-5.

The majorities of both the *Li* and *Lombera-Camorlinga* courts found the Departments views persuasive. *See Li*, 206 F.3d at 63-66 (outlining the Department's position, concluding that the question of whether the treaty created individual rights need not be decided because, irrespective of whether the Vienna Convention or the bilateral consulate convention in that case creates individual rights, neither suppression of evidence nor dismissal of indictments is an appropriate remedy for violation of the notification provisions of Article 36 or of the bilateral agreement between the United States and China); *Lombera-Camorlinga*, 206 F.3d at 887-88 (summarizing the Department's position and concluding that a foreign national's postarrest statements should not be suppressed solely because the statements were made before the foreign national was told of his or her right to consular notification).

Neither of these rulings was unanimous, and so we have had the benefit of the views of the dissenting judges in each of the cases. In sum, the dissenting judges at each circuit were of the view that the Vienna Convention does bestow individual rights, and would have required a prejudice analysis, with the initial burden on the defendant to show prejudice, after which the government would be required to rebut the showing, failing which suppression would be an appropriate remedy. *See Li*, 206 F.3d at 68-78 (Torruella, C.J., concurring in part and dissenting in part); *Lombera-Camorlinga*, 206 F.3d at 888-91 (Boochever, J., dissenting) and at 892-95 (Thomas, J., dissenting).

■ As was the *Martinez-Lazo* court, 100 Wn. App. at 875, we are persuaded that even assuming that the Vienna Convention bestows rights enforceable by individuals as well as member states (a proposition that we seriously doubt but need not decide), suppression of evidence is not a remedy for violation of Article 36 nor of the bilateral agreement between the United States and the Philippines.

Rather, the remedy lies in diplomatic and political communications, or in litigation before the International Court of Justice where member nations have signed the optional protocol to the Convention allowing such litigation, and by means of education of law enforcement officers as to their obligations under the treaty and any applicable bilateral agreements—information that is readily available to every prosecuting attorney and police agency in this state, in the State Department's booklet described at 579 note 2, *supra*.

We are not persuaded by the opinions of the dissenting judges in the First and Ninth Circuits that a prejudice analysis would provide a workable solution—indeed, we agree with the *Li* majority that in matters of state the national interest has to be expressed through a single authoritative voice, namely the State Department, which speaks for and on behalf of the President in such matters. 206 F.3d at 67. We agree with the Department that there exists the potential for conflict between the judicial and executive branches of government if the criminal courts were to become involved, at the behest of foreign nationals seeking private enforcement of treaty obligations, while at the same time the State Department and officials of the sending state might be involved in a dispute over whether a treaty obligation was violated, or could be engaged in delicate negotiations with respect to whether a treaty obligation would or would not be enforced in a particular instance—perhaps to secure an advantage in an unrelated matter. 206 F.3d at 68; Answers at A-5. The dissenting judges failed to address these concerns. In our view, that omission undermines the persuasiveness of the dissenting opinions.

In sum, assuming without holding that appellants have standing to enforce violations of the Convention, we follow *Martinez-Lazo*, *Li* and *Lombera-Camorlinga* and conclude as a matter of law that suppression of statements given voluntarily after a valid waiver of *Miranda*[3] rights is not a remedy for violation of Article 36 of the Convention, or of

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1996).

the bilateral agreement between the Philippines and the United States.

In so ruling, we note that the only case provided by appellants in which violation of Article 36 has resulted in suppression of evidence is *Trujillo v. State*, 8 S.W.3d 824 (Tex. App. 2000).[4] That case is not relevant to our inquiry because it is based on a provision of the Texas Criminal Code that provides that evidence obtained in violation of any federal, state or constitutional provision shall not be admitted against the accused. Moreover, that decision was withdrawn by the Texas Court of Appeals in light of *Rocha v. State*, 16 S.W.3d 1, 19 (Tex. Crim. App. 2000), where the Texas Court of Criminal Appeals held that "treaties do not constitute 'laws' " for purposes of the Texas Criminal Code's exclusionary provision.

We next turn to appellants' individual claims.

## *STATE v. ACOSTA*

Jose W. Acosta appeals his convictions of first degree burglary and second degree rape. He claims that the trial court erred when it failed to suppress his statements to the police where they failed to inform him of his right to contact the Honduran Consulate. We conclude that Acosta cannot now raise the suppression issue because he failed to preserve his objection below and because the Supremacy Clause does not convert violations of treaty rights into violations of constitutional rights. Thus, Acosta cannot show manifest constitutional error, and his claim is barred from appellate review.

## FACTS

On September 16, 1998, Bellevue Police Detective Carlos Preciado arrested Acosta on suspicion of burglary and sexual assault.

---

[4] Opinion withdrawn and superceded on second reconsideration in light of *Rocha v. State*, 16 S.W.3d 1 (Tex. Crim. App. 2000), as stated in *Trujillo v. State*, 25 S.W.3d 270 (Tex. App. 2000).

Acosta is a Honduran national. His primary language is Spanish. When Detective Preciado arrested Acosta, he read him his *Miranda* rights two times in Spanish. Most of Detective Preciado's contact with Acosta occurred in Spanish. After he was transported to the Bellevue Police Department, Acosta was again read the *Miranda* rights. Detective Preciado obtained Acosta's consent to take a taped statement, which took approximately 25 minutes. Acosta was not informed that he had a right to contact his consulate.

At Acosta's CrR 3.5 hearing, the prosecutor informed the court that it did not intend to offer Acosta's statement in its case in chief, but sought a ruling on the voluntariness of the statement in the event the prosecutor wanted to use it for impeachment purposes. Acosta objected to the admissibility of the statement, arguing that his right to contact his consulate had been violated. Regarding the consulate issue, Acosta referenced Immigration and Naturalization Services (INS) regulations and also alluded to cases from federal jurisdictions, but did not provide the court with specific legal authority. Acosta informed the court that he would attempt to get that authority over the lunch hour. The court ruled that the statement was made voluntarily, but reserved judgment on the consulate issue: "I am not knowledgeable about this federal law, and it may override state and *Miranda* law, and I will await any further briefing from Defense Counsel as to whether it means that any statement given to the detective would not be useable." Report of Proceedings (Apr. 28, 1999) at 64-65. Acosta never provided the court with legal authority and never obtained a final ruling on the issue. The court entered a finding of fact that Acosta had not been advised that he could contact his consulate but reached no legal conclusion with respect to the finding.

The State did not introduce Acosta's statement during its case in chief but utilized it in rebuttal to impeach Acosta's

testimony. The jury found Acosta guilty of first degree burglary and second degree rape. This appeal followed.

## DISCUSSION

The State argues that Acosta is barred from raising his assignment of error because he failed to preserve his objection below. The State asserts that Acosta abandoned his suppression argument by failing to obtain a final ruling on the right to consul issue. We agree.

In *State v. Riker*, 123 Wn.2d 351, 369, 869 P.2d 43 (1994), the Court held that a defendant who does not seek a final ruling on a motion in limine after a court issues a tentative ruling waives any objection to the exclusion of the evidence. Similarly, in *State v. Koloske*, the Court noted that "[w]hen the trial court refuses to rule, or makes only a tentative ruling subject to evidence developed at trial, the parties are under a duty to raise the issue at the appropriate time with proper objections at trial." 100 Wn.2d 889, 896, 676 P.2d 456 (1984), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988). *Cf. Breard v. Greene*, 523 U.S. 371, 375-76, 118 S. Ct. 1352, 140 L. Ed. 2d 529 (1998) (holding that habeas petitioner scheduled to be executed in the State of Virginia for capital murder could not raise claim of violation of his rights under the Vienna Convention on federal habeas review where he failed to preserve the claim by raising it in state court proceedings; Vienna Convention does not trump subsequent federal statute requiring habeas petitioners who claim to be held in violation of treaties of the United States to develop factual bases for their claims in state court as a precondition of federal habeas review).

During his CrR 3.5 hearing, Acosta raised the consulate issue but did not provide the court with legal authority for his assertion. The court stated that it would await further briefing on the issue before making a ruling. Acosta, however, did not revisit the issue until he filed this appeal. Because Acosta failed to present adequate legal grounds for

the court to make an informed decision on the issue, and failed to obtain a final ruling, his claim is not reviewable on appeal, absent manifest constitutional error.

■■■ Under RAP 2.5(a)(3), Acosta may allege an error not properly preserved below if it is a manifest error affecting a constitutional right. *State v. Scott*, 110 Wn.2d 682, 757 P.2d 492 (1998). The error Acosta alleges, failure to suppress a statement taken in violation of the Vienna Convention, does not touch upon a constitutional right. As noted by the Fourth Circuit in *Murphy v. Netherland*:

> [E]ven if the Vienna Convention on Consular Relations could be said to create individual rights (as opposed to setting out the rights and obligations of signatory nations), it certainly does not create *constitutional* rights. . . . [T]he Supremacy Clause does not convert violations of treaty provisions . . . into violations of *constitutional* rights.

116 F.3d 97, 100 (4th Cir. 1997). Acosta thus cannot rely on RAP 2.5(a)(3).

Acosta does not challenge the trial court's finding that his statement was voluntarily given; that finding is, therefore, a verity on appeal. Because the alleged error does not affect a constitutional right, the manifest constitutional error exception does not apply and we decline to review Acosta's claim.

Acosta's conviction is affirmed.

## *STATE v. JAMISON*

Edgar Jamison appeals his conviction on three counts of rape of a child in the first degree. Jamison assigns error to the trial court's denial of his motion to withdraw his guilty plea. He claims that the motion should have been granted because he received ineffective assistance of counsel and because he entered a plea of guilty involuntarily. As Jamison fails to provide a basis to disturb the guilty plea, the trial court properly denied the motion.

## FACTS

Pursuant to a complaint lodged by his stepdaughter, police arrested Jamison on suspicion of child sexual abuse. Jamison is a Philippine national who has been in the United States since 1979.

On March 28, 1996, Seattle Police conducted a warranted search of Jamison's home and seized a videotape of Jamison having sex with his stepdaughter. On March 29, 1996, Seattle Police Detective Tim Wear interviewed Jamison. The prosecution certified that Jamison validly waived his *Miranda* rights and provided Detective Wear with a taped confession. Jamison was not advised of his right to contact his consulate.

On February 10, 1997, Jamison pleaded guilty to three counts of rape of a child in the first degree. Jamison filed a Motion to Withdraw Guilty Plea on March 11, 1998, claiming ineffective assistance of counsel because his attorney failed to move to suppress his statements based on violation of Jamison's treaty rights, and also failed to adequately advise him of the immigration consequences of his guilty plea. During the hearing on Jamison's motion, his former counsel testified that he repeatedly discussed deportation with Jamison, and that shortly before Jamison's entry of the plea of guilty, he told Jamison that he was going to be deported and that to counsel's knowledge there was no way to get around deportation. Jamison's Statement of Defendant on Plea of Guilty contained the following language: "If I am not a citizen of the United States, a plea of guilty to an offense punishable as a crime under state law is grounds for deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." Clerk's Papers at 9 (Statement on Plea of Guilty). Counsel did not provide Jamison with a copy of the federal statute governing deportation and did not tell him that following deportation he would not be able to return to the United States.

Counsel also testified that he was aware of a potential

legal issue arising from the fact that Jamison had not been advised of his rights under the Vienna Convention, but was also aware that the issue had not been decided favorably to defendants in challenging confessions. Defense counsel had hoped to obtain a Special Sex Offender Sentencing Alternative (SSOSA) for Jamison. When that possibility failed, he negotiated a low-end standard range with the prosecutor, who was threatening to recommend a high-end sentence or an exceptional sentence if Jamison were found guilty following a trial.

Jamison testified that he was forced to plead guilty "because if we took the case to trial then I'd have to pay [former counsel] $25,000, and . . . the sentence that I would be given would be in the higher range." Report of Proceedings (Mar. 25, 1999) at 51.

Following the hearing on Jamison's Motion to Withdraw Guilty Plea, the court denied the motion, finding that Jamison had been advised categorically before he entered his plea that he would be deported and noting that Jamison's counsel for the motion had cited no legal authority for the proposition that Jamison's confession should have been suppressed based on failure of the police to advise him of his rights under the Vienna Convention. The court also noted that Jamison's former counsel had recognized the potential issue but was aware that the issue had not been decided favorably to defendants. Thus, Jamison's former counsel provided effective assistance and there was no manifest injustice.

This appeal followed.

## DISCUSSION

Jamison assigns error to the trial court's denial of his motion to withdraw his guilty plea. Jamison contends that under CrR 4.2, his motion to withdraw should have been granted because he was given ineffective assistance of counsel and his plea was not made voluntarily.

We review the trial court's denial of a motion to

withdraw a plea for an abuse of discretion. *State v. Olmsted*, 70 Wn.2d 116, 119, 422 P.2d 312 (1966). A court abuses its discretion if its decision is based on clearly untenable or manifestly unreasonable grounds. *Id.*

To warrant plea withdrawal under CrR 4.2(f), Jamison must show that it is necessary to correct a manifest injustice. A manifest error may arise where a defendant receives ineffective assistance of counsel or where the plea was involuntary. *State v. Taylor*, 83 Wn.2d 594, 596, 521 P.2d 699 (1974).

A strong presumption of competent representation attaches to the review of an ineffective assistance claim. *In re Personal Restraint of Pirtle*, 136 Wn.2d 467, 487, 965 P.2d 593 (1998). To establish ineffective assistance of counsel, Jamison must show first that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness. Prejudice is met if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Pirtle*, 136 Wn.2d at 487. In the context of guilty pleas, Jamison must show that, but for counsel's errors, he would not have pleaded guilty. *State v. Garcia*, 57 Wn. App. 927, 932-33, 791 P.2d 244 (1990).

Jamison first contends that he was denied effective assistance because his attorney failed to move to suppress his confession to the police on the grounds that he was not informed of his Vienna Convention right to contact his consul. The court found that Jamison's attorney's performance was "well within the broad range of reasonable professional assistance." Clerk's Papers at 101. Assuming arguendo that a reasonably competent attorney would have made the suppression motion, Jamison must show that the trial court would have granted the motion. *State v. Martinez-Lazo*, 100 Wn. App. 869, 874, 999 P.2d 1275 (citing *State v. Contreras*, 92 Wn. App. 307, 319, 966 P.2d 915

(1998)), *review denied*, 142 Wn.2d 1003 (2000). However, as both we and the *Martinez-Lazo* court have now concluded, since suppression of statements given voluntarily after a valid waiver of *Miranda* rights is not an available remedy for violation of Article 36 of the Vienna Convention, Jamison cannot show that such a motion would have been granted.

Accordingly, Jamison has failed to demonstrate a reasonable probability that the outcome of the proceeding would have been different if counsel had moved to suppress Jamison's confession based on the violation, and the trial court properly denied Jamison's motion on this ground.

Jamison next contends that he was denied effective assistance of counsel because he was not informed that a guilty plea would result in mandatory removal proceedings and would bar his reentry into the United States following deportation. However, the trial court found, based on substantial evidence in the form of testimony from Jamison's former counsel that the court found to be credible, that Jamison was advised categorically by counsel that he would be deported. Moreover, as the trial court found, Jamison was properly advised as required by RCW 10.40.200 that his plea of guilty constituted grounds for deportation, exclusion from admission to the United States, or denial of naturalization.[5]

In addition, while due process requires that a guilty plea be made with knowledge of its direct consequences, *In re Personal Restraint of Peters*, 50 Wn. App. 702, 704, 750 P.2d 643 (1988), a deportation proceeding that occurs subsequent to the entry of a guilty plea is a collateral consequence of that plea. *In re Personal Restraint of Yim,*

---

[5] RCW 10.40.200(2) provides that courts shall determine that a defendant has been advised of "the following potential consequences of conviction for a defendant who is not a citizen of the United States: Deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." The statute provides further that a guilty plea signed by the defendant with such advice creates a presumption that the defendant was so advised. But if a defendant is subject to deportation and has not been so advised, the statute requires the court to "vacate the judgment and permit the defendant to withdraw the plea of guilty and enter a plea of not guilty." *Id.*

139 Wn.2d 581, 588, 989 P.2d 512 (1999) (citing *State v. Ward*, 123 Wn.2d 488, 512-13, 869 P.2d 1062 (1994)). As such, Jamison need not have been advised, on due process as opposed to statutory grounds, of the immigration consequences of the plea. *See Yim*, 139 Wn.2d at 588 (citing *Ward*, 123 Wn.2d at 512). *See also State v. Holley*, 75 Wn. App. 191, 198, 876 P.2d 973 (1994) (holding that RCW 10.40.200 does not create a constitutional right to be advised of immigration consequences; therefore, failure to comply with statute does not create constitutional harm).

But Jamison claims that the 1996 amendments to the Immigration and Naturalization Act by way of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) (AEDPA) converted his deportation from a collateral consequence to a direct consequence of conviction because the AEDPA eliminates potential deportation relief for aggravated felonies, including sexual abuse of minor children, by removing the authority of the United States Attorney General to grant discretionary waivers in such cases. *See* 8 U.S.C. § 1228(a)(3)(A), (b)(5). Thus, Jamison reasons, deportation is now mandatory and as such represents a definite, immediate and largely automatic effect on the range of his punishment. *See Cuthrell v. Dir., Patuxent Inst.*, 475 F.2d 1364, 1366 (4th Cir. 1973) (distinction between direct and collateral consequences of a plea turns on whether the result represents a definite, immediate and largely automatic effect on the range of a defendant's punishment); *In re Peters*, 50 Wn. App. at 704 (court has an obligation to verify that a defendant has been informed of all direct consequences of his plea). The trial court rejected this argument:

Assuming that the federal law changed, and that a person in Mr. Jamison's situation faces mandatory removal rather than potential deportation . . . and that a person who has been removed can never return to the United States, such consequences remain "collateral," that is, the removal and exclusion consequences are the subject of a federal civil procedure.

Clerk's Papers at 100. Some months after the trial court ruled, Division Three of this court rejected the same argument. *See Martinez-Lazo*, 100 Wn. App. at 876-78. Deportation with no possibility of reentry into the United States, even if an absolute certainty following conviction of an aggravated felony as defined by federal law, remains collateral to the criminal prosecution because it is " ' "not the sentence of the court which accepted the plea but of another agency over which the trial judge has no control and for which he has no responsibility." ' " *Id.* at 877 (quoting *In re Peters*, 50 Wn. App. at 704 (quoting *Michel v. United States*, 507 F.2d 461, 465 (2d Cir. 1974))).

Jamison's attorney categorically advised Jamison that he would be deported following his guilty plea. We agree with the trial court that the fact that defense counsel failed to provide Jamison with a copy of the relevant federal statute and failed to inform him that, once deported, he could never reenter the United States is immaterial because deportation and exclusion from reentry are collateral consequences of Jamison's guilty plea, not part of his punishment. That a defendant may subjectively feel that deportation and permanent exclusion is harsh punishment indeed does not alter the analysis. Jamison has not shown that his counsel's performance was deficient. "If either part [of *Strickland*] is not satisfied, the inquiry need go no further." *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). As Jamison has not shown ineffective assistance of counsel, the court did not abuse its discretion in denying his motion to withdraw the plea on this ground.

Jamison next contends that his decision to plead guilty was not voluntary because he did not know that federal law made deportation a certainty following his conviction. Under CrR 4.2(d), a guilty plea is not valid unless it is entered into knowingly and voluntarily. As discussed above, there is ample evidence in the record to support the trial court's finding that Jamison's counsel informed him categorically that he would be deported. Moreover, before executing the

plea agreement, Jamison was properly warned under RCW 10.40.200:

> P.A.: Do you understand that if you are not a citizen of the United States that this guilty plea will affect your ability to be in the United States?
>
> Jamison: Okay.

Clerk's Papers at 88. (Transcript of Guilty Plea). Jamison signed a Statement on Plea of Guilty that states "[i]f I am not a citizen of the United States, a plea of guilty to an offense punishable as a crime under state law is *grounds for* deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." Clerk's Papers at 9 (emphasis added).

Jamison's final contention is that the language "grounds for deportation" in the Statement on Plea of Guilty did not adequately inform him that he would be subject to removal in light of the AEDPA and thus that his plea was involuntary. The language in Jamison's Statement on Plea of Guilty was based on RCW 10.40.200(2), which states:

> Prior to acceptance of a plea of guilty to any offense punishable as a crime under state law, except offenses designated as infractions under state law, the court shall determine that the defendant has been advised of the following *potential* consequences of conviction for a defendant who is not a citizen of the United States: Deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States. . . . Absent written acknowledgement by the defendant of the advisement required by this subsection, the defendant shall be presumed not to have received the required advisement.

(Emphasis added.)

The AEDPA now refers largely to "removal proceedings" rather than to "deportation, exclusion from the United States, or denial of naturalization." Although the Legislature may wish to amend RCW 10.40.200 to incorporate this change in terminology or to specify that for certain felonies defined as aggravated felonies under federal law will result in more than just a "potential" consequence of such a

conviction, and although prosecutors may wish to similarly amend Statement of Defendant on Plea of Guilty forms in light of the AEDPA, we do not find a substantive difference between the use of "removal" and "deportation" in the language of the AEDPA.[6] Indeed, we think the term "deportation" is more descriptive and likely to be better understood than the term "removal proceedings." Moreover, any deficiencies there may be in RCW 10.40.200 or the plea of guilty form, or both, as compared to the harsh requirements of federal law in the case of aggravated felonies, do not create a constitutional right. *See Holley*, 75 Wn. App. at 198 ("Even if we assume that RCW 10.40.200 imposes a duty on attorneys to discuss immigration consequences with their clients, we find no basis to conclude that the statute also creates a constitutional right for a defendant to be so advised."). This is because immigration consequences remain collateral consequences of a guilty plea and not part of a defendant's punishment.

Neither do we agree with Jamison that any such deficiencies equate to misinformation with respect to immigration consequences of a plea of guilty. Jamison relies on *Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998), *cert. denied*, 526 U.S. 1003 (1999), a case involving aliens prosecuted for document fraud, which held that unclear and misleading INS forms violated defendants' due process rights. That case is inapposite, as it was based on the fact that the forms at issue did "not explain or even mention the severe immigration consequences that will ordinarily result if the alien fails to request a hearing—specifically, the high probability that the alien will be deported immediately." *Id.* at 1038. The Statement on Plea of Guilty that Jamison signed clearly informed him that conviction of a crime was grounds for deportation, exclusion from admission to the United States, or denial of naturalization. This description of the immigra-

---

[6] In fact, while 8 U.S.C. § 1228(a)(3)(A) states that "the Attorney General shall provide for the initiation and, to the extent possible, the completion of removal proceedings," the statute continues to refer to deportation as well. *See, e.g.*, § 1228(c), which states that "[a]n alien convicted of an aggravated felony shall be conclusively presumed to be deportable from the United States."

tion consequences of a criminal conviction remain as true after adoption of AEDPA as before. All that has changed is that the United States Attorney General no longer has discretion to waive these consequences with respect to defendants convicted of aggravated felonies. Neither RCW 10.40.200 nor the plea of guilty form here at issue mention any discretion on the part of the United States Attorney General to waive these consequences. Accordingly, Jamison could not have been misled into believing that the Attorney General might exercise discretion in his case when in fact federal law had removed that potential option because of the nature of Jamison's crime. This is particularly true in light of his counsel's categorical explanation that if he pleaded guilty, Jamison would serve his sentence and then be deported, and that his counsel knew of no way that this could be prevented.

In sum, we conclude that the assistance provided by Jamison's counsel was not constitutionally inadequate and that Jamison entered his plea of guilty knowingly and voluntarily.

Accordingly, Jamison's conviction is affirmed.

GROSSE and APPELWICK, JJ., concur.

Review denied at 144 Wn.2d 1018 (2001).